## DONNER v. AMERICAN SHEET & TIN PLATE CO.

(Circuit Court, W. D. Pennsylvania. April 24, 1908.)

No. 22, May Term, 1906.

1. PATENTS—INTERFERING PATENTS—SUITS TO DECLARE VOID.

To make out a case under Rev. St. § 4918 (U. S. Comp. St. 1901, p. 3394), for adjudging a patent void for interference, there must be an actual conflict and not mere infringement, and in determining whether there is an interference the court cannot go beyond the claims as to which it is charged so as to consider the patent as a whole.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 146, 147.]

2. SAME—INFRINGEMENT—ROLLING BLACK PLATE.

The Donner patent, No. 620,541, for a method and mechanism for rolling black plate by means of a set or sets of rolls arranged in continuous train, to which the sheets are successively fed on a moving table or conveyor, the sheets being matched or made into packs in the course of the process, and reheated between the sets of rolls as required, while no one of the claims alone may express the full invention, as a whole was not anticipated, and discloses invention. Claim 5, for pinch rollers to hold the matched sheets in place and shape while being fed into the rolls, is void for anticipation, but claim 4, covering mechanism for matching the sheets without interrupting the continuity of the operation, discloses novelty and invention. Such claim also *held* infringed.

In Equity. Suit for infringement of letters patent, No. 620,541 for rolling black plate, granted to William H. Donner February 28, 1899. On final hearing.

James I. Kay, for complainant.

James K. Bakewell and Charles Neave, for defendants.

ARCHBALD, District Judge.[1] So far as the bill proceeds for the cancellation of the alleged interfering claims of the Bray patent, it is clear that it cannot be sustained. To make out a case under section 4918 of the Revised Statutes (U. S. Comp. St. 1901, p. 3394), where this is provided for, there must be actual conflict, and not mere infringement. Gold Ore Separating Co. v. United States Disintegrating Co., 6 Blatchf. 307, Fed. Cas. No. 5,508; Mfg. Co. v. Craig (C. C.) 49 Fed. 370. Otherwise, whenever a defendant justified under a patent, and was found to infringe, a cancellation could be ordered, even though the infringing patent was for a valuable improvement, which, subject to the principal invention, the patentee had a perfect right to maintain. It has therefore been held that the interference, authorizing a cancellation, does not exist between a patent, having a dominant, broad, claim, and a later one, having a subordinate, specific claim. Stonemetz Machinery Co. v. Brown Machine Co. (C. C.) 57 Fed. 601; Brown Co. v. Stonemetz Mach. Co., 58 Fed. 571, 7 C. C. A. 374. Nor, unless the claims in controversy cover the same mechanical construction or device. Simplex Railway Appliance Co. v. Wands, 115 Fed. 517, 53 C. C. A. 171. And in determining whether there is an interference, within the meaning of the statute, the court cannot go beyond the claims

[1] Specially assigned.

as to which this is charged, so as to consider the patent as a whole. Mfg. Co. v. Craig (C. C.) 49 Fed. 370. Stonemetz Machinery Co. v. Brown Machine Co. (C. C.) 57 Fed. 601.

In the present instance, comparison is made between claim 4 of the Donner (complainant's) patent, and claims 6 and 10 of the Bray, both relating to a mill for the rolling of black plate; the former of which (claim 4) is, in terms, for "a continuous train in which two of the sets of rolls are sufficiently removed from each other to allow the bars or sheets to be matched between" the said rolls; while the latter (claim 6) is for "a combination with two pairs of reducing rolls arranged in tandem, of a matching device located between and in line with the rolls" the matcher being provided with suitable stop mechanism; and (claim 10) for "a continuous mill having a series of sets of rolls arranged in tandem and matching mechanism interposed between two of the sets." Conceding, of necessity, that these claims are much alike, dealing with the same general idea as they do, they nevertheless differ in the way of treating it, to such an extent that a cancellation of either of them is not warranted. Critically analyzed, Donner simply calls for a matching pass or space in which to match; while Bray declares, in the one claim, for a matcher or matching device with suitable stop mechanism, and in the other for matching mechanism or means to effect the matching, without more. However closely they may thus approach each other, patentably considered, they are not the same, the one being directed to a place where matching can be done, and the other to the means for bringing it about. It may be that, having regard to the scope of the invention as disclosed by the specifications, matching mechanism is to be read into the Donner claim, of which more anon. But taking it as it stands, as at present we must, while the fact of matching is no doubt involved in it, the same as in the claims of the Bray, each is concerned with a different phase, which, on an application to cancel, is to be regarded as distinct. Even if this were not so, and the Donner is to be.taken as though matching mechanism were actually expressed, this necessarily would be of the same general character as that described in the specifications, and the same being true of that called for in the Bray, the simple stop fingers of the one are not to be identified with the highly organized arrangement provided for in the other, however they may both lead to the same result. The case is therefore to be disposed of, entirely aside from the question of interference, on the validity of the complainant's patent and the infringement charged.

As already stated, the patent in suit relates to the rolling of black plate, which is the basis of commercial tin, and is much thinner than ordinary sheet. According to the art previously practiced for nearly 200 years and which is still in extended use, the metal, in the form of heated bars, of about the width intended for the finished sheet is fed back and forth, two following each other at a time, between plain faced, adjustable rolls, arranged in single stands, two rolls high, and tended by three workmen, a feeder or rougher, and a catcher, to actually handle the metal, and a skilled roller or watcher, to oversee the whole. After

each passage of the metal through the rolls, the rolls are screwed closer together, until the sheet has been brought down to what is known as a matching thickness, which is usually after the fourth reduction, upon which two or more of the sheets are seized by the workmen with tongs and put together into a pack, and in this shape, with or without reheating, they are again rolled, on the same or another stand, the rolling in packs, by reason of the extra pressure so secured, having the effect of reducing the sheets in a way that nothing else will. If required to be reduced to a still lower gage; the sheets are pulled apart, so as to prevent their sticking or welding—a fruitful source of trouble —and after having been doubled over like a sheet of paper are again reheated and rolled, and for extreme reduction, they may be redoubled and rolled again. Finally, when all has been accomplished that is desired in this direction, the sheets are put singly through smoothing rolls to give them a superficial finish. Between each of the original reductions or passes, the rolls have to be carefully adjusted for the next turn, for which service a person with especial skill, to watch or "nurse" them, is required, the heat imparted by the metal being an element to be reckoned with, and often affecting the rolls unequally, spoiling the sheets. The packs also, on being put into the furnace with others which are hotter, tend to draw down the temperature of the latter and cool or harden them, which has likewise to be carefully considered and attended to. These are some, but by no means all, of the difficulties involved in the process, which in all its phases is a delicate one calling for the skill of trained and high-priced workmen. Preserving the essential steps of it, the complainant claims to have arranged for its successful performance on a series of rolls, set in tandem or continuous train, the heated metal, instead of being reduced on single stand rolls, which have to be adjusted after each reduction, being passed on from one pair of rolls to another, by means of a conveyor or moving table, each pair being set to do the particular work assigned to it, and being kept at the proper temperature or contour for doing so, by virtue of the uniform heat of the bars or sheets which are fed to it in a regular and continuous manner. Being the first to make use in this way of continuous rolling for the manufacture of sheet plate, contrary to the prevailing view as to its practicability, and claiming to have thereby made a radical departure in the plate rolling art, the complainant asks to be protected in the patent which he has obtained for it, against which it is charged that the defendants infringe.

The character of the invention, and the objects sought to be accomplished by it, will be best shown by reference to the specifications, where, after describing the hand method, with single stand rolls, previously pursued, and the disadvantages of it, it is said by the inventor:

"The object of my invention is to provide a plant and method of working the metal whereby the time and labor consumed in passing the metal back over the rolls is obviated and the iron reduced more rapidly and without changing the adjustments of the rolls. A further object is to provide a plant of this character wherein the metal after each set of reductions is reheated in a furnace-chamber at a point remote from the sets of packs which have been subjected to one less series of reductions and to obtain a continuous plant wherein the various sets of rolls are maintained at substantially the

same temperature by reason of the metal passing therethrough in a continuous or regular manner, thus giving more accurate sheets and reducing the liability of breaking the rolls."

Proceeding by reference to the accompanying drawings to particularly describe the apparatus designed to embody the invention, it is said:·

Fig. 1.

Fig. 2.

"Figure 1 is a diagrammatic plan view, partly in section, showing a plant * * * constructed in accordance with my invention; and Fig. 2 is a detailed view of a stop mechanism.

"In the drawings, A represents a heating-furnace having chambers 2, 3, and 4, in which the bars are heated. This furnace may be provided with one or as many chambers as desired. When the bars are brought to the proper heat in this furnace, they are taken to a continuous mill, D, consisting of several sets of two-high rolls, of which I have shown six sets, arranged in tandem; * * * each set of rolls being provided with a feed-table or conveyor, * * * which is shown as consisting of a series of sprocket-chains passing over positively-driven sprocket-wheels at their ends, though other forms of positively-driven feed-tables may be employed, if desired. * * * The metal being placed upon the first feed-table passes through the set of rolls, 5, and being reduced therein emerges upon the second feed-table, which carries it to the rolls, 6, in which it receives a further reduction, and thence passes on in a similar manner through the sets of rolls, 7 and 8. The next set of rolls, 9, is spaced a sufficient distance from the set, 8, so that the plates may be matched at this point, if desired, the feed-table between rolls 8 and 9 being correspondingly lengthened for this purpose. To stop the plates upon the table between the rolls 8 and 9, I show tilting fingers, 29, arranged between the chains near the end of this table * * * to be swung into upper position to stop the metal or into lowered inoperative position by a lever, 30. From roll, 9, the metal passes through set, 10, and on emerging from this set of rolls the metal, which has now been reduced to a suitable gage for doubling, emerges upon a feed-table, 12, by which it is carried to a doubler, 13, upon which it is suitably doubled and taken to the furnace, B, having chambers, 14, in which the doubled pack is reheated. The pack being heated in one of the chambers of this furnace is drawn out and reduced in the continuous train, E, it being first placed upon a conveyor, 15, and carried to a set of rolls, 16, in which it is reduced and emerges upon a feed-table, 17, by which it is carried to another set of rolls, 18, in which it is further reduced and drops upon the feed-table, 19, by which it is taken to the doubler, 20. After being doubled therein the pack is then taken to a reheating-furnace, C, and being reheated in one of the chambers, 21, thereof is taken to a third continuous train, F, consisting of three sets of rolls * * * having feed-tables or conveyors * * * similar to those of the other trains. The metal passing through these three sets of rolls is reduced therein to the proper gage of sheets and emerges upon a conveyor, 26.

"In order to prevent twisting or spreading of the pack between the sets of rolls after it has been reduced in gage to a point where this may occur, I preferably provide in front of and closely adjacent to the reducing-rolls small rollers, 27, which act upon the packs passing through these rolls, guiding them and preventing twisting and spreading by their action upon the surface of the sheets in the same manner as a workman operating with tongs. I have shown these rollers as used upon the last six sets of the reducing rolls; but they may of course be placed wherever necessity demands between the rolls. The number of continuous trains or mills, as well as the number of sets of rolls in each train, may be varied as desired without departing from my invention, according to the number of reductions and the gage of sheet which are desired. The advantages of my invention will be apparent to those skilled in the art, since the labor and time of reducing the metal are greatly decreased, a greater number of reductions can be given before reheating the pack, and the number of workmen is materially reduced. Since I use one pair of rolls for each reduction instead of making several reductions on one mill, the reductions are more uniform and accurate than where the adjustments are being continually changed. The adjustments of the tension of the rolls which regulates these reductions are made easy for an unskilled workman, whereas the adjustment by the ordinary method heretofore used requires the close attention of a skilled roller. The packs being fed to the rolls in a continuous and regular manner, the rolls are kept at a substantially uniform temperature, and hence at about the same contour or shape, giving more accurate sheets than formerly and avoiding breakage of the rolls by reason of contracting and expanding thereof."

On this eight claims are formulated, the complainant relying however only on the fourth and fifth.

"1. In the manufacture of black plates or sheets, a heating-furnace, a continuous train made up of several sets of rolls arranged adjacent thereto in tandem, a doubler arranged to act upon the metal after passing through the continuous train, a heating-furnace to which the doubled pack is taken, and another continuous train to which the metal is taken from the latter furnace; substantially as described.

"2. The method of making black-sheets, which consists in heating a series of packs, rolling each pack successively by passing it through the several sets of rolls of a continuous mill, doubling each pack, reheating the doubled packs in series, rolling each pack successively by passing it through the several sets of rolls of a second continuous train, and continuously supplying the packs to the furnaces and to the continuous trains; substantially as described.

"3. The method of making black-sheets, which consists in heating a series of packs, rolling the packs successively by passing them through a continuous train made up of separate sets of rolls, doubling the rolled packs, placing the doubled packs in a series in a furnace-chamber at a point remote from those being rolled, rolling each pack successively by passing it through a second continuous train of rolls and supplying the packs in series to the furnaces and to the rolls, so as to keep the latter at a substantially uniform temperature; substantially as described.

"4. In a plant for rolling black-plate, a continuous train in which two of the sets of rolls are sufficiently removed from each other to allow the bars or sheets to be matched between said sets of rolls; substantially as described.

"5. In the manufacture of black plates or sheets, the combination of several sets of rolls arranged in tandem in a continuous manner, and driven rollers arranged between them, said rollers being arranged to prevent buckling; substantially as described.

"6. In the manufacture of black plates or sheets, the combination with a set of rolls, of driven chains arranged to carry the plates or sheets to said rolls, and rollers in front of the rolls and arranged to prevent twisting or spreading of the metal; substantially as described.

"7. In a plant for the manufacture of black-plate, the combination with several continuous trains, each made up of two or more sets of rolls arranged in tandem, of furnaces arranged between the trains and arranged to heat the metal coming from each train; substantially as described.

"8. In the manufacture of black plates or sheets, a heating-furnace, a continuous train made up of several sets of rolls arranged in tandem, a doubler arranged to act upon the metal after passing through the continuous train, a heating-furnace to which the doubled pack is taken, another continuous train to which the metal is taken from the latter furnace, and positively-driven feed mechanism between the sets of rolls of each continuous train, substantially as described."

It will be observed from this somewhat extended consideration of the terms of the patent, which is necessary, in my judgment, to a correct understanding of it, that it is combinedly for a method or process and an apparatus or mill on which to practice it, the claims being correspondingly given up, some to the one and some to the other. And, each being supposed to be devoted to different phases or features of the same general invention, all have therefore to be taken into consideration in determining its exact nature and scope. Thus—passing by the second and third claims which deal solely with the method or process— of the apparatus claims, the first is concerned with the first half of the operation, covering the initial heating furnace, the first set of reducing rolls, arranged tandem, in continuous train, the intermediate doubler and reheating furnace, to double and heat the pack which has been made up, and a second continuous train to which the sheets are taken

from the latter furnace; from which the eighth claim differs only in having the additional element of positively driven feed mechanism to act as a conveyor and pass the metal on continuously to the rolls; while the seventh merely declares generally for several continuous trains, without other specification than that each is to be made up of two or more sets of rolls, arranged in tandem, with furnaces in between the trains to reheat the metal coming severally from them. It is in this setting that we find the fourth and fifth claims which are in issue here; the one of which provides for two of the sets of rolls of a continuous train being removed a sufficient distance from each other to allow the bars or sheets to be matched between them; and the other, for driven rollers arranged between the rolls of a continuous train, to pinch and hold the matched sheets, so as to prevent buckling; the sixth claim— which although not involved completes the list—specifying, in addition to pinch rollers, the further feature of driven chains, as in the eighth claim, to carry the sheets to the rolls.

Without stopping at this point to determine the exact character of the general invention underlying these claims, there can be little doubt that, taking it as described in the specifications, an operative device is so shown, which is not anticipated by anything previously existing in the plate rolling art. It may be that the whole problem of rolling plate by continuous-train, instead of single-stand rolls, has not been thereby solved, nor that all claimed for it has been realized, more watching and nursing of the rolls being required than assumed, and too much scrap or defective sheets being produced. Also that a lower gage than 18 or 20 cannot be relied upon with any degree of confidence, so that single stand rolls have to be resorted to for any further commercial reduction. But with all that, it must be confessed that the way has undoubtedly been blazed by the complainant for the use of continuous rolling, with one or more sets of rolls arranged in tandem, the sheets being carried to and passed through each set in a continuous and regular manner, by means of a feed-table or conveyor, and the various operations of matching or packing, doubling, and reheating, being conducted expeditiously in between. This has been accomplished in the face of the prevailing opinion that the continuous rolling of black plate was impracticable; and it has resulted in a material increase of the output, with a saving at the same time of reheating and labor which goes far to establish its utility. There is evidence, also, that it furnished the impulse, if not the idea, of which the Bray patent, under which the defendants are operating, was the outcome, which followed after a communication to them of his invention by the complainant, and an unsuccessful attempt by them to buy his patent from him for $1,000. Taking all things into consideration, as to the general apparatus and method described in the patent, an inventive advance would seem to have been thereby made in the art.

It is true that, prior to 1893, at Teplitz, Austria, there was a continuous mill with rolls in continuous train, a sheet from which was exhibited at the World's Fair in Chicago in that year; following which Mr. McMurtry, president of the Apollo Iron & Steel Company, went to Teplitz in 1894 and saw the mill in operation there, consisting of five

stands of rolls in which the sheets were reduced to about 12-gage. Returning home he discussed the subject with Mr. Norton, of Chicago, who was engaged in the tin can business, and had experimented in the rolling of thin sheets, who also visited Teplitz to see the mill. Mr. McMurtry also consulted with Mr. Julian Kennedy, of Pittsburg, one of the most eminent mechanical engineers of the country, as the result of which a mill was designed by him and put up at Vandegrift, Pa., for the production by continuous rolling of long bars to be made the basis from which sheets were subsequently to be rolled in the ordinary way. In the practice at Teplitz, however, there was no matching or making of packs, the metal being rolled in a long unbroken sheet, and the reduction stopping short of the production of commercial plate. And as to the mill at Vandegrift, while the rolling of thin narrow sheets, suitable for tin cans, may have been discussed, it was never actually used for any such purpose, and much less was there any matching or rolling of packs upon it, except recently to meet the exigencies of this case. Possibilities of that kind may perhaps have resided in it, but they are of no account in the present consideration, the arrangement of rolls in this comparison having to be taken for what was actually done on them, and not for what, with more insight, might have been.

Neither does the Howell publication stand much better. In this, two sets of rolls are shown, the first or blooming rolls taking the slab direct from the furnace and reducing it, after four passes back and forth, to about an eighth of an inch thick. It is then cut and packed and taken to the second set, arranged in continuous train, where it is rolled into long narrow strips, suitable for making tin cans, in which shape it is coiled up, instead of being boxed. Here no doubt, there is a combination of single stand and continuous or train rolling. But there is no connected feed mechanism, as in the device in suit, nor any matching up of sheets while in transit between rolls, the packs being formed by cutting up the sheets with shears on the way between the two sets of rolls and putting them together by hand, after which they are taken on buggies to the second or continuous set. The rolls of this set also, instead of being geared together, are detached and driven separately, so that each shall have a distinct and separate speed, the strips of metal being arranged to pass into one just as they are leaving the other, the distance between the several rolls being progressively spaced to conform to the increasing length of the sheets in order to bring this about. While then, to a certain extent, continuous rolling as well as a rolling in packs, is so shown, it is not at all of the character of that specified in the patent, the distinctive thing being that there is no matching pass between the continuous rolls, the attempt to overcome which, by the suggestion that the space between them is ample for it, if desired, again seeking to rely on what might be rather than what is.

The same is true of the Garrett mill, which is somewhat similarly arranged, the billet or slab being first reduced by repeated passes back and forth through a single stand of rolls, and then carried to a shears, where the sheet is cut and matched, and the matched packs then put through a succession of alternate rolls and heating furnaces, the rolls

at each stand being set side by side and the number successively increased in order to speed the process. But in all this there is nothing but hand rolling, the rolls at each set being simply the old single stand rolls, through which the metal is passed back and forth, each stand also being individual and distinct, there being no feeding of the metal to them on a connecting feed-table, in a continuous and regular manner as in the patent in suit.

The only other things to be reckoned with in this connection are: (1) A vague suggestion in the Jackson (1889) patent that the method of rolling sheet metal, there described, could be accomplished, if desired, in a continuous mill, instead of by the groove and plate rolls shown in the drawings; but without something very much more definite and specific, this clearly is entitled to no consideration, the problem of continuous rolling being altogether too complex to be disposed of in any such off-hand manner. (2) A set of continuous rolls shown in the Jones (1896) patent for rolling tin plate; but besides having no provision for matching the sheets, this is an utterly impracticable device, the inventor, although having only four sets of rolls, through which the metal is to pass but once, unmatched, apparently expecting to reduce a billet to a gage thin enough for tinning, which is impossible. (3) The showing made in various patents of train rolls, arranged either side by side or in tandem, for the rolling of rails, bars, rods, or other similar articles; but this amounts to no more than that train rolls are not unknown in the general rolling art, which, with all that is to be so implied, does not carry us far, shape rolling and plate rolling, while branches of the same art, requiring such separate and distinct treatment as to afford very little if any assistance to each other by way of suggestion or analogous use.

So far, the case has been discussed as though the invention in suit was for a continuous mill for the rolling of sheet plate, without regard to how it was to be made up, except that it should have a set or sets of rolls arranged in continuous train, to which the sheets should be regularly fed, on a moving table or conveyor, the sheets being matched or made into packs in the course of the process, whereby the necessary additional reduction would be secured, these being recognized as essential features of any such device; and it is as to an apparatus of this kind that the conclusion is reached that nothing to anticipate it is to be found in the prior art. If this broad view can be maintained, the defendants also undoubtedly infringe. Originally they had two mills, built on the continuous plan, one at their Monongahela plant in Pittsburg, which has been given up, and the other at Sharon, Pa., which is still in use. In each of these, there was first a series of reducing rolls, arranged tandem in continuous train, through which the sheets were put singly, being fed thereto by conveying mechanism of one kind or another. There was then a matching of the singles by means of an incline or slide, down which they severally dropped to a second series of rolls, similarly arranged, on a lower level, the head sheet being stopped at the bottom, and the one following it made to overlay it, the two being squared up sidewise and endwise, as well as centered for the next pass. Pinch rollers then grasped the pack and held it, until it

was fed into the next train, through which it passed in that shape, and on emerging was taken to a mechanical doubler and then to a heating furnace, after which the final reduction and finishing were effected on the usual single stand rolls. But the difficulty is to identify this with the claims of the patent. Omitting the second and third which are process claims, it certainly does not comport with the first, nor the eighth, each of which—to say nothing of anything else—calls for another continuous train, besides the original one, after a second heating. Nor yet with the seventh, which has several continuous trains, with a heating furnace in between each. Nor with the sixth, which, in addition to being a mere variation of the fifth, to be considered later on, has driven chains to carry the sheets to the rolls, which chains the defendants do not use. The complainant is thus compelled to fall back on the fourth and fifth, on which, as already stated, he relies, the one apparently declaring, as a special feature, for a matching pass, and the other for pinch rollers, to prevent the sheets from buckling. The case turns therefore on the effect to be given to these claims.

There are several criticisms of the fourth claim, some of which however, manifestly, cannot be sustained. It draws upon the credulity, for instance, if indeed it does not reflect on the intelligence of the court, to argue that the Vandegrift mill shows a stop and a matching pass. This mill, as an alleged anticipation of the continuous rolling of black plate, has already been considered, but this is a different point. The stop, which is there employed, consists merely of a rough piece of angle iron, hung on a pivot, which is let down by hand, whenever for any reason it becomes necessary to stop the operation and prevent the bar from entering the next train of rolls, as for example, if it has a rough end, or the next train requires adjustment, or the finished bar at the delivery end is not yet out of the way. No doubt this effectively arrests the course of the metal, and the feed-table may be long enough to have one bar overlay or match the other if that was what was wanted. But to go out of the way, in this clumsy fashion, to have the machine do something, for the mere name of it, which it was never designed to do, and only by a strained use can be made to, merely serves to make plain the means to which the defendants are compelled to resort in order, perchance, to make out anticipation.

The same may be said also of the apparatus shown in the Howell publication, where the rolls of the continuous train, as it is urged, are sufficiently removed from each other to allow the sheets to be matched, if desired, before they enter the last four sets, thus fulfilling the terms of the patent. But the mere capacity for this, without any suggestion or arrangement for it, affords no argument against the novelty of the present device, particularly when it is remembered that the making up of the sheets into a pack in the Howell mill is expressly provided for after they have been taken to the shears to be cut, and before they go to the continuous train, thus absolutely negativing any idea of their being matched up in any other way afterwards.

It is further suggested, however, that it is a common thing in the rolling art, to allow extra space between two successive sets of rolls, when some supplemental or special treatment of the metal is to be un-

dertaken, and that it involved no invention therefore in providing, in the same way, for a place to match. Thus, in the Jones patent, a rotary brush is introduced to remove scales or other foreign substances from the sheets. And in the Stephens & Cooper a device between two sets of rolls is shown, to automatically turn the rod which is being made, in order to successively present its various sides to the action of the rolls. But this, like the other things urged, is of no significance. A matching pass is something new in the art, as to which there was nothing to afford any analogy; and even if, in providing for it, advantage was taken of a not unusual expedient, it is the nature of the device, and the function it is to perform, and not the place, which serves to characterize it.

But the other infirmities of the claim are not so easily disposed of. All that is specified, as it will be noted, is a continuous train, in a plant for rolling black plate, in which two of the sets of rolls are sufficiently removed, to allow the bars or sheets to be matched between them. No doubt this assumes, as it in effect provides, that matching is to be done, notwithstanding that the specifications seem to speak doubtfully about it, saying, "if desired," as though it was intended to be left optional. It may be conceded also, that, as a necessary result, matching mechanism is implied, the same as housings for the journals, or other like essentials, and that the claim is to be read, as though this was in fact set forth in it, although it would be more satisfactory if it had actually been done. But the only thing, after all, which is declared for, as already said, is a continuous train, of a general and unspecified character, except that two of the sets of rolls are to be so removed from each other as to allow of matching. The whole efficiency and novelty of the device, as a machine for the rolling of black plate, is thus made to depend on the two characteristics, that the rolls shall be set in continuous train, and that two of them shall be sufficiently spaced at some point, to admit of the making up of a pack. No doubt the specifications may be resorted to, to help this out, but only incidentally, and to a limited extent. Diamond Drill Co. v. Kelly (C. C.) 120 Fed. 289. As for instance, to establish that the different rolls are to be so adjusted as to progressively reduce the sheets, and do not have to be changed for each pass; that the sheets are to be fed to the rolls in continuous and regular succession, in order to keep their contour substantially uniform; and that the matching is to be done, and the matching space introduced, somewhere about after the fourth reduction. But with all the assistance so derived, the question remains as to just what is to be made out of the claim. Taking it, however, as covering a continuous train with a matching pass, it must be confessed, that an operative device, so far as it goes, is shown. That is to say, as the first step in the process, to bring the metal down by continuous rolling to a certain gage. But not, for the complete rolling of commercial plate. Else why the elaboration by the inventor of that which is made to follow, as shown by the specifications and drawings? Or why provide, as he does, for a doubling and reheating of the pack, and its reduction in a second set of rolls, with a redoubling, reheating, and further reduction in still a third? These being apparently made

essential steps in the method or process, found side by side in the patent with the apparatus designed by the inventor to practice it, it is manifest that the mere specification of a continuous train, with two sets of rolls sufficiently removed to allow of matching, which is only a part of it, cannot be made to stand for the whole, and that the claim, if sustained, must accordingly be accepted for considerably less. The full inventive conception, for which the complainant is entitled to credit, without reference to the terms of any particular claim, may be regarded as consisting in the successful transference of the essential steps of ordinary plate rolling to a mill with rolls set in continuous train. To this, a rolling in packs is necessary, after a certain reduction has been reached, and a place to match the packs without interrupting the continuity of the operation, must therefore be provided for. So far as the claim in controversy proceeds for that, it may be good. But it is to-this, merely as a feature of the whole device that it must be limited, and by it also that it must be judged. The mistake is in not recognizing this, and in trying to have it stand broadly for the whole idea of making sheet plate on continuous rolls. It may be, as the result, that none of the claims is expressive of the full invention, and it no doubt would be · difficult to say just what would adequately meet that requirement. But this is no reason for amplifying either of them, so as to have them stand for more than they consistently can.

But with all that has been so said, and limiting the claim in question to the single feature of a matching pass, why is not that, of itself, both novel and inventive, so as to sustain the infringement charged? That it was new, in a mill designed for the rolling of black plate, arranged in continuous train, to provide a place for matching the sheets, without interrupting the continuity of the operation, by an extra spacing of the rolls, is abundantly proved by what has been said above, a device of this character being absolutely unprovided for and unknown in the only instances which approach anywhere near to the use of a continuous mill. Was it inventive then to appreciate the necessity for this and arrange for it in the way that was done? That it was essential to the success of the operation is beyond question. It may not afford a complete solution of it, as the further steps provided in the patent show, but it is the key to the situation, the importance of which the defendants themselves have demonstrated, by adopting and elaborating upon it as they have. The simplicity of the means employed for effecting the matching is not necessarily against it. Nor that it takes the place of that which was already practiced in the hand rolling method. It is not as a step in the process, but as a means for effecting it, that the device is to be judged. It may be that the claim is meager, and that it would be strengthened if matching mechanism was actually specified. But something is to be conceded to the somewhat primary character of the general invention, of which it forms a part, means for stopping and matching the sheets being necessarily implied in providing a place where it is to be done which would otherwise be without purpose. It must be confessed that the stop fingers, described in the specifications, are rather primitive, and that the matching of the sheets is awkward, one or the other having to be raised by hand to permit them to overlap, without which, following end on end, they

are sure to get stalled. But passing this by as we may, the essentials of an operative device remain, which is novel in design, sufficiently effective in function, and highly important in results, which, in all the efforts towards the rolling of sheets in continuous train, no one else seems to have thought out. If the mechanism employed were all that was involved, it might perhaps be regarded as within the skill of the ordinary workman. But it is the idea which counts, which having escaped other inventors may well be accepted as satisfying the law. It may not be conclusive of the question, but it certainly is confirmatory of it, that in the Bray patent under which the defendants operate, noticed above, a matching device between rolls arranged in tandem, and suitable stop mechanism, were considered sufficiently distinct and inventive, to be made the subject, by themselves, of specific claims, and if so, they would seem to be the same here. While, then, the claim under consideration cannot be sustained to the extent of holding it comprehensively expressive of the full inventive idea with which the complainant is entitled to credit, by which rolls in continuous train were adapted and applied to the production of black plate, as covering an essential feature of it, whereby, without interrupting the continuity of the operation, a place to match the sheets is provided between rolls, I am of the opinion that it is good, being sufficiently distinct to stand as an independent invention, although involved in the other, against which, with all their elaboration upon it, the defendants clearly infringe.

The same favorable conclusion cannot be reached, however, with regard to the fifth claim. This, as it will be remembered, is for pinch rollers, to hold the matched sheets, in order to prevent the twisting, spreading, or buckling of the pack as it is fed into the next succeeding set of rolls. Without stopping to consider whether the defendants avoid infringement by the special arrangement of parts which they employ, it is sufficient to observe that feed rolls of the same general character, and performing exactly the same function, were to be found already in use in the plate rolling art, and could not therefore be monopolized by the complainant as attempted in this claim. Thus, in the Sheldon (1893) patent in order, as it is said, to prevent the metal sheets, when presented to the rolls for the final reduction, after the breaking up of the packs, from pinching or buckling in making the pass, an idle friction roller is arranged in front of the rolls, and in close proximity if not in actual contact with the upper one, the effect of which is to feed forward the sheets, in a uniform manner, presenting the front edge evenly to the rolls, without sagging or the consequent buckling or pinching. It is true, that the idle roller here is not positively driven, as called for in the claim, and that distinction is therefore able to be made against it. But with all that, there is such a close approximation in it to the device in hand, as goes a long way towards anticipating the claim. Even more to the point is the McFadden feed-table (1896), designed for automatically feeding the sheets in a continuous mill from one set of rolls to the next. To assist in the operation, rollers are arranged between the different stands, one of which is positively driven, and the other frictionally, which not only convey or feed the sheets from one set of rolls to the next, but, at the same time,

prevent them from bending or twisting, thus insuring their proper delivery. The only distinction which is attempted with regard to this is that it is designed to operate only upon single sheets, and not upon two or more made into a pack. But the use is clearly analogous and indeed could hardly be closer, being in the very same art in a case of continuous rolling. It certainly makes no difference in the character of the operation, whether it is employed to prevent one sheet from twisting or buckling or to prevent two, the mechanical means and the operative principle in each case being the same. The Bessimer (1879) British patent also presents a similar device in use in the same art; in a mill for the manufacture of black plate, positively driven feed rollers being set in front of the different stands or reducing rolls, which rollers are made to grasp the sheets or bars by means of hydraulic pressure and feed or force them forward into the reducing rolls through which they pass, the evident, if not the expressed, purpose of this being to control the feed. In view of these references, therefore, the fifth claim cannot be sustained.

The fourth claim of the patent, however, being good, a decree in favor of the complainant will be entered as to that in the usual form, with costs.