## KELLY WELL CO. v. KIRSCHKE CONCRETE WELL CO. et al.

(Circuit Court of Appeals, Eighth Circuit. August 5, 1926.)

No. 7237.

1. Patents ⬄127.

Whether claims of one patent interfere with claims of another, within Rev. St. § 4918, is to be determined by reference to claims themselves (Comp. St. § 9463).

2. Patents ⬄167(1).

Claims of patent are construed as any contract, and specifications and designs may be referred to, to throw light on doubtful language.

3. Patents ⬄328—No. 1,360,301, for well strainer, held not to interfere with nor infringe Kelly patent, No. 1,256,906, for well points and casings.

Patent No. 1,360,301, covering "well strainer," to remove sand from water before it enters body of well casing, held not to interfere with, nor infringe, earlier Kelly patent, No. 1,256,906, covering well points and casings.

4. Patents ⬄177.

Patent claim for a combination covers exact combination claimed and nothing more.

Appeal from the District Court of the United States for the District of Nebraska; Thomas C. Munger, Judge.

Suit by the Kelly Well Company against the Kirschke Concrete Well Company and another. From a decree of dismissal, plaintiff appeals. Affirmed.

A. L. Joseph, of Grand Island, Neb., and Charles P. Craft, of Aurora, Neb., for appellant.

Willard Eddy, of Omaha, Neb. (William Suhr, of Grand Island, Neb., on the brief), for appellees.

Before SANBORN, Circuit Judge, and SCOTT, District Judge.

SCOTT, District Judge. This is an appeal from a decree of the District Court of the United States for the District of Nebraska, confirming a master's report and dismissing the plaintiff's bill. Kelly Well Company, a Nebraska corporation, plaintiff, filed its bill against Kirschke Concrete Well Company, an Arizona corporation, and Oscar R. Kirschke, in substance alleging that William Kelly was the·original and first inventor of a certain new and useful improvement in well points and well screens and had obtained on February 19, 1918, letters patent of the United States, numbered No. 1,256,906; that said William Kelly on March 4, 1918, sold and assigned to the Kelly Well Company the entire right, title, and interest in said letters patent and invention, which assignment was recorded on March 28, 1918, and that plaintiff was the sole and exclusive owner of said letters patent; that after the issuance and assignment of said letters patent and about the 30th day of November, 1920, Oscar R. Kirschke, defendant, through inadvertence, oversight, and error of the office of the Commissioner of Patents, wrongfully secured letters patent on a pretended invention described as a "sand strainer," said letters patent being numbered No. 1,360,301, which pretended invention wrongfully and illegally uses and embodies the invention in concrete wells, concrete well screens, and concrete well points, covered· and secured by letters patent No. 1,256,906, and that said letters patent No. 1,360,301, so procured, is an interfering patent as against letters patent No. 1,256,906; that said Oscar R. Kirschke caused to be organized under the laws of Arizona the Kirschke Concrete Well Company, which company since its organization, without license from the plaintiff, is engaging in making, using, and vending concrete wells, concrete well screens, and concrete well points in violation of the plaintiff's right, and the said Oscar R. Kirschke has transferred his said patent in whole or in part to the Kirschke Concrete Well Company; that the defendants and each of them, since the date of letters patent No. 1,256,-906, without license, have been and are now manufacturing, selling, and using concrete wells, concrete well screens, and concrete well points of a design, construction, and process method substantially as described in letters patent No. 1,256,906, and fully and completely covered in the claims thereof; and that the defendants threaten, and intend, unless restrained, to continue, so to infringe plaintiff's letters patent.

Plaintiff prays for an injunction restraining the defendants from further infringement, and for a decree canceling letters patent No. 1,360,301, as an interfering patent. The defendants, answering the bill, admit the procuring of letters patent No. 1,360,301, deny that they were issued by inadvertence, oversight, fraud, or mistake, and by appropriate allegation plead absence of invention in the structure described in plaintiff's patent, and that said patent does not interfere with letters patent No. 1,256,906, and joins issue upon the plaintiff's allegation of infringement. It will therefore be observed that plaintiff's bill has a double purpose: It is a bill for canceling an alleged interfering patent under section 4918 of the Revised Statutes of the United States (Comp. St. § 9463), and also a bill to enjoin infringement in the usual form.

Upon the issues stated the cause was ·referred to a special master to ascertain and report the facts, with his conclusions of law. The special master heard the cause and filed a very clear and comprehensive report. The report in the last analysis presents and determines two questions only: The question of interference, and the question of infringement. Upon the authority of Boston Pneumatic Power Co. v. Eureka Patents Co. (C. C.) 139 F. 29, the special master seems to have assumed that he was not called upon to determine the question of patentability, in view of his conclusion upon the questions of interference and infringement. The special master found that none of the claims of letters patent No. 1,360,301 interferes with either of the claims in letters patent No. 1,256,-960, and further found that the defendants had not infringed letters patent No. 1,256,-960. The plaintiff filed 14 exceptions to the special master's report; the cause was heard before the District Court upon the report of the special master, the plaintiff's exceptions, and the evidence and proceedings therein; and upon argument and submission the District Court overruled the exceptions to the

report of the special master, confirmed the report, and entered a decree dismissing the plaintiff's bill.

The first 11 exceptions to the report of the special master challenge findings of fact as being against the evidence. In order to clear the discussion, we will say at this point that we are convinced that the trial court was entirely correct in overruling these exceptions and confirming the findings of the master. Exception 12 goes generally to the special master's findings of fact and conclusions of law, 13 excepts to the failure of the master to render findings and conclusions respecting the patentability of defendants' invention, and 14 is a general exception to the special master's findings of fact and conclusions of law without elaboration. We think the trial court was correct in overruling these exceptions. The trial court, however, in its decree finds patent No. 1,360,301 valid. We think, however, that finding was unnecessary, and may be here treated as superfluous. As heretofore indicated, there are but two questions for determination on this record: The question of interference, and the question of infringement. We take these questions up in their order.

[1] It is well settled that the question whether a claim or claims of one patent interferes with a claim or claims in another patent is to be determined by a reference to the claims themselves. Walker on Patents (5th Ed.) § 317; Dederick v. Fox (C. C.) 56 F. 714; Donner v. American Sheet & Tin Plate Co. (C. C.) 160 F. 971: Gold & Silver Ore Separating Co. v. United States Disintegrating Co., 10 Fed. Cas. 539.

[2] It is also well settled that, in construing a claim, the court proceeds as in the construction of any other contract. The specifications and designs may be referred to, to throw light upon any doubtful language. We therefore proceed to examine the claims in these respective patents, to ascertain whether any claim in defendants' patent is in substance identical with any claim in that of the plaintiff.

[3] The specification of plaintiff's patent states:

"This invention relates to well points and particularly to casings adapted for use in wells, the same being of a sectional type and provided with means whereby they are bound together in a manner to afford means of communication between the external and internal surfaces of the said casings at the joints, means being provided for permitting liquid to find its way to the passages of the joints while at the same time preventing the accumulation of foreign substances, such as gravel, dirt, and the like, into the ducts or passages or in the interior of the casing.

"A further object of this invention is to provide means for holding the sections of the casing in spaced relation to each other and provide a bearing whereby one may be supported on the other, while they are, at the same time, bound together, as stated."

The claims of plaintiff's patent are two, and as follows:

"1. A well point comprising sectional casings, each having slots in its outer surface, the said slots being flared inwardly from the said outer surface, the ends of said sections being beveled inwardly, lugs at the ends of said sections adapted to abut lugs of the contiguous sections, said sections having longitudinally disposed apertures, and sets of bolts extending through said sections, one set of bolts being in stepped relation to the other set of bolts.

"2. In a well point, sectional casings, each having slots extending longitudinally thereof from end to end, the ends of said sections being beveled, lugs on the said ends adapted to engage lugs of the contiguous sections, said sections having apertures therethrough, bolts projecting through apertures of two contiguous sections, and bolts extending through other apertures of each of said sections and through apertures of other contiguous sections."

The specification of the alleged infringing patent, No. 1,360,301, states:

"My invention is an improvement in sand strainers, and has for its object to provide mechanism of the character specified for use in connection with well casings for thoroughly removing sand from the water before it enters the body of the well casing, the strainer having a sand chamber between the bore thereof and the exterior for receiving the sand together with means for causing the sand to settle.

"In the drawings—

"Figure 1 is a side view of the improved strainer;

"Fig. 2 is a top plan view;

"Fig. 3 is an enlarged partial longitudinal section;

"Fig. 4 is an enlarged side view;

"Fig. 5 is a detail section of a portion of the strainer.

"In the present embodiment of the invention, the strainer is composed of a series of similar sections, each section 1 having one end annularly rabbeted externally as at 2, and the other end annularly counterbored or reamed as at 3, to receive the rabbeted end

of the adjacent section. Each section is also provided in its wall with a series of longitudinally extending passages 4, which are sand chambers for receiving the sand and the said passages or chambers extend the full depth of the section.

"Series of slots 5 and 6 are provided in the sections, extending longitudinally thereof, the said slots being parallel and spaced apart from each other, and preferably the slots of each series are arranged in groups of three, as clearly shown in Fig. 1. Each series of slots is separated by an annular imperforate portion as shown in Fig. 1, and the slots 5 are intermediate the ends of the sections, while the slots 6 are at the ends of the sections, and open at the ends.

"Each group of three slots opens into one passage or sand chamber 4, and the reduced or rabbeted portion 7 of each section has a series of vertical grooves or flutes 8, which open by lateral grooves or recesses 9 into the sand chambers, the said grooves 9 being formed at the annular shoulder between the rabbeted portion and the body of the section. The rabbeted portion of each section is of slightly less length than the counterbored portion of the section, so that when the reduced end of one section is fitted into the counterbored end of the other section there will be a space, indicated at 10 in Fig. 3, between the annular shoulder formed at the inner end of the ream or counterbore and the reduced end of the section. This spaced end provides a communication between the upper ends of the grooves 8 and the interior of the strainer, while the grooves 9 provide communication between the lower ends of the grooves 8 and the sand chambers.

"Thus when the sections are placed, it will be seen that passages lead from the sand chambers inwardly and upwardly and again inwardly to the bore of the well casing, so that the water is constrained to rise during its passage from the sand chamber to the bore of the casing."

The claims of defendants' patent are as follows:

"1. A sand strainer for attachment to well casings, comprising similar sections, each having one end counterbored and the other end reduced to enter the counterbored end of the adjacent section, each section having a series of vertical sand passages in its walls and being slotted externally at each passage, and having passages leading from the sand passages to the interior of the casing and extending upwardly from the sand passages to the interior of the casing, said last-named passages being formed between the counterbored surface and the outer surface of the reduced portion, and between the end of the reduced portion and the annular shoulder formed at the inner end of the counterbored portion of adjacent sections.

"2. A sand strainer for use with well casings, comprising a series of sections, each having one end reduced and the other end counterbored to receive the reduced end of the adjacent section, said sections having longitudinally extending sand passages in their walls and opening externally, and having passages leading from the sand passages to the interior of the sections and upwardly from the sand passages.

"3. A sand strainer for use with well casings, comprising a cylindrical structure having longitudinally extending sand passages in its wall opening externally and having other passages leading from the sand passages inwardly and upwardly to the interior of the casing.

"4. A sand strainer for use with well casings, comprising a hollow structure having longitudinally extending sand passages in its wall opening externally and having other passages leading from the sand passages inwardly and upwardly to the interior of the casing.

"5. A sand strainer for use with well casings, comprising a hollow structure having longitudinally extending sand passages in its wall opening externally and having other passages leading from the sand passages inwardly to the interior of the casing.

"6. A sand strainer for use with well casings comprising a hollow structure having sand passages in its wall opening externally and having means for constraining the water to pass upwardly from the sand passages before entering the strainer."

The plaintiff, as illustrating the principle upon which its device operates, offered in evidence certain structures, Plaintiff's Exhibits 2 and 3. The special master's findings of fact, numbered 5 to 8, inclusive, describe such structures and we here quote the same:

"5. The structures mentioned in the last preceding finding are constructed of concrete and consist of circular blocks with slits on the external surface of the blocks, extending inwardly and beveled inwardly. On the external surface, the width of the slits varies, but is approximately ³/₃₂ of an inch. The length of the slots where one end of the water channel or passageway, into which they open, is closed, varies from 10½ to 11½ inches, and where both ends of the slot is the length of the block, 12 to 12½ inches. The slots or channels extend inwardly for

approximately ⅞ of an inch, varying from ¾ to ⅞ of an inch. The channels or passageways at the back are circular or oval, and the faces toward the block are triangular, the widest portion being approximately where they commence to curve at the back, and the narrowest portion at the outer surface.

"6. The number of slots or vertical openings in the exterior is 53, and the longitudinal or vertical water channels or passageway is likewise 53. Plaintiff has manufactured screen blocks of a larger diameter than 18 inches and up to 25 inches, and in the instance of the larger block having a clear inside diameter of 24 to 25 inches, the number of slots or openings on the outside of the blocks was 76, and the longitudinal or vertical slots, channels or water passages was also 76.

"7. The thickness of the wall of the casing or screen of the structures mentioned in finding 4 is 3½ inches through the body portion, or approximately 4 inches over the bead or rim which is shown in Plaintiff's Exhibit 8, the bead adding ½ inch to the thickness of the wall. The height of each section is 12 inches; inside diameter, 18 inches; and outside diameter, measured from the outer periphery, is approximately 25 inches over the beading or rim. The ends of the section have portions which are beveled inwardly, which, when measured between the actual periphery of the block and the inner bore, is approximately ⁷/₃₂ of an inch, and when block similar to Exhibits 2 and 3 are superimposed one upon the other, the total open space at the inner periphery at the wall of the screen block is approximately ⁷/₁₆ of an inch. The weight of each of the circular blocks (Plaintiff's Exhibits 2 and 3) is 80 pounds.

"8. On the beveled portion of the ends are six lugs, 2 inches in diameter, and opposite each alternate lug in the outer portion of the wall is a circular opening or aperture extending through the entire block, which opening is ⅝ of an inch in diameter. In said Exhibits 2 and 3 there is no opportunity for tie bolts to have nuts on them in the beveled end, and it would not be possible to use them with the tie bolts in the manner illustrated in plaintiff's patent. Kelly testified that it would be possible to use Plaintiff's Exhibit 2 with sets of bolts extending through the sections, one set of bolts being in stepped relation with the other set of bolts, but admitted that it would not be done in accordance with the plan depicted in the patent."

Plaintiff also offered in evidence a structure, Plaintiff's Exhibit 5, a sand strainer manufactured under the Kirschke patent, and this structure is described in special master's findings of fact numbered 14 to 17, inclusive, which we here quote:

"14. The dimensions of said structures are: Clear inside diameter of the bore of said strainer is 15 inches; total diameter measuring across the outer periphery is 24 inches; height of annular shoulder or neck above main body of the block, measured from the exterior of the block is approximately 2⅛ inches. The thickness of the shoulder, that is, horizontal thickness of the shoulder itself, measuring over the inside of the flute, approximately one inch. The counter sunk or counter bored portion of the block is of the depth of approximately 3 inches, and the width of the counter sunk portion is 1½ inches.

"15. The maximum thickness of the walls of said sand strainer is 4¾ inches, and the thickness at the counterbored portion is 3¼ inches. At the opposite end from the outer periphery of the block into the shoulder or neck the thickness is 3¼ inches. The openings or slits on the outer surface of the block are of the width of between ¹/₁₆ and ¹/₃₂ of an inch, and the length of those slits or openings on the outer surface is approximately 8⅛ to 8¼ inches.

"16. The water channels or passageways or slots embodied in the wall of the structure are approximately one inch in diameter and are circular, and two of the slits in the external surface of the block open into each channel or passageway. The length of these water channels or slots or passageways through the main body of the block is 12⅛ inches. The number of the external slits opening into the water channels or passageways is 80, and the number of such channels or passageways embodied in the wall of the block is 40.

"17. The width of the fluted portion at the top of the slit is one inch and at the bottom of the slot is approximately ½ inch. On the neck itself, the dimension of the fluted portion width of the outer portion one inch, and on the lower portion approximately ½ inch and the depth is ½ inch. The maximum distance of the inner edge of the water channel or passageway from the external periphery of the block is approximately 2 inches, and the width of the opening one inch."

The defendants offered in evidence some 14 other patents relative to well screens and devices for concentrating water in well casings, illustrative of the prior art. Oral tes-

timony was also offered by the plaintiff and defendants.

As stated by appellant's counsel in the brief: "The essential concept in complainant's invention is as follows: The admission of water from the exterior surface of the screen (after freeing it from sand, soil particles and other substances that are entrained or held in suspension in the water) into open passages provided in the interior of sectional casing structure; these passages serving as conduits or channels for the water, conducting it into other channels and thus to the interior of the casing." The testimony and the patents in evidence illustrative of the prior art tend strongly to show, and the special master found that every element of the Kelly patent was found separately in the prior art. And the special master concluded that, if the Kelly patent was to be considered valid, it must be as a combination invention. After a careful consideration of the record and the briefs of counsel, we are of opinion that the special master was correct both in his finding and conclusion.

In the light of this assumption, however, the appellant's counsel contends that the structures defined in the claims of appellees' patent are essentially the same as those described in Plaintiff's Exhibits 1 and 2 of plaintiff's patent, that the two structures described function the same, and that any variations in the device described are mere mechanical equivalents. The testimony on the part of the defendants, as well as analysis of the claims themselves, constrain us to a different conclusion. The special master finds dissimilarity at the joint connections of the sections which effects a material difference in function. In the plaintiff's device the water gathered at the joint through the slits and vertical passages passes directly over the beveled edges downward into the interior of the well. In the defendants' device the water gathered at the same point is described to pass upward through the fluted apertures in the annular shoulder and thence into the interior of the well. In our opinion the special master was correct in drawing this distinction.

We are not convinced that the annular shoulder with fluted apertures, the purpose of which is to cause the water to rise at the joint before passing into the well, is a mechanical equivalent of the bevel edge described in the plaintiff's device, or of any other part of plaintiff's device. We are convinced that the structure described in each of the claims of the defendants' patent No. 1,360,301, is essentially different from that described in either claims 1 or 2 of the plaintiff's patent, and that such device or devices are intended to function differently. It therefore follows that no claim of the defendants' patent No. 1,360,301, interferes with either claim of the plaintiff's patent.

We come now to the question of infringement. Much that has been said upon the subject of interference applies with equal force to the matter of infringement. The special master found at finding No. 21: "Neither of the defendants has at any time manufactured any structures of the kind defined and claimed in plaintiff's patent, but the defendant Kirschke Concrete Well Company has manufactured a sectional well casing similar to Plaintiff's Exhibit 5, under an assignment of the Kirschke patent by him to said company. The first blocks were manufactured either in the later part of May or in June, 1921." Exhibit 5 is shown in the photograph Exhibit 6, and is accurately described in the specification and claims of the Kirschke patent.

[4] It is well settled that a claim for a combination covers the exact combination claimed and nothing more. Defendant assumes that the various elements combined are old, and any material variation in the combination of elements, as by the omission of one or more, or by the substitution for one or more of other elements not equivalents, varies the combination and avoids infringement. From what we have said on the subject of interference, it necessarily follows that the defendants have not infringed the plaintiff's device. It is clear that the defendants' manufactured product is as distinct from the device described in the plaintiff's patent as is the device described in the claims of the defendants' patent. We therefore conclude that the trial court committed no error in approving the report of the special master and dismissing the plaintiff's bill.

The judgment of the District Court is therefore affirmed.