## MANTLE LAMP CO. OF AMERICA v. GEORGE H. BOWMAN CO.
### No. 5606.
Circuit Court of Appeals, Sixth Circuit.

Nov. 3, 1931.

---

George I. Haight, of Chicago, Ill. (Thomas G. Steward, of Washington, D. C., W. H. F. Millar, of Chicago, Ill., and Wm. C. Keough, of Cleveland, Ohio, on the brief), for appellant.

Before DENISON and MOORMAN, Circuit Judges, and SIMONS, District Judge.

DENISON, Circuit Judge.

This is the usual patent infringement suit, based upon the Blair patent No. 1,435,199, of November 14, 1922, for a "heat insulated receptacle." It discloses the type now common on the market, which comprises a large mouthed receptacle, holding a gallon or more, insulated within an outer casing which is in the general form of a pail or a large bottle, and which efficiently keeps a substantial amount of food or drink hot or cold for several hours. The patent was sustained in the Monarch and the Macomb Cases, in the Northern district of Illinois (unreported), but these decrees were reversed by the Seventh Circuit Court of Appeals [22 F.(2d) 93, 95], and the patent was held to be lacking in invention.

In the present case, the defendant filed an answer, relying upon the former decision, and setting up a long list of earlier patents. It did not take proofs and did not appear at the final hearing in the court below. The plaintiff voluntarily put in evidence all the patents set up in the answer. The district judge felt obliged to follow the earlier decision, and dismissed the bill. Upon this appeal, the defendant did not appear; and we accept the assurance of plaintiff's counsel that they know of no reason for defendant's default, except lack of sufficient pecuniary interest. At our suggestion, we have been furnished with copies of the records and of the briefs in the former cases, and have thus been quite fully informed as to the proofs and the contentions therein.

The modern art of efficient insulated receptacles for domestic use seems to have been begun about 1907, with the now very familiar thermos bottle, and with similar structures known as "icy-hot," or by other names. These comprised a double wall of glass with an intervening vacuum; from necessities of manufacture they were very delicate and fragile; and they had usually no greater capacity than one quart, though a two-quart size was made to some extent. Beginning about 1907, this vacuum type for keeping liquids hot or cold became exceedingly popular. The invention now involved was put upon the market about 1918, under the trade-name "Aladdin." It comprised a much larger receptacle, holding from one up to three or four gallons, and, by reason of its size and permissible large neck, was adapted to keep hot or cold not only liquids, but solid or semi-solid food. It was well received, and had large and increasing sales. Within a short time, it and similar articles made by others, and which are said to be infringements, had established their position as practically a new article of manufacture, and plaintiff was far and away the leader in the sales. Up until the proofs were taken, it had sold over one million of them.

What Blair did, in substance, was to depart from the vacuum type; to rely for his heat insulation upon a relatively nonconducting packing between his outer and inner walls; to use an outer casing made of metal, which would be strong enough to receive ordinary shocks, and an inner container made of glass or some vitreous material that would allow the minimum of heat to escape therefrom; and to unite the outer and inner casings at their upper or neck ends, so that the inner would be pendently supported by the outer, and so that the uniting means or bond should also serve as an insulator against heat or cold, and as a seal to exclude air or moisture from the packing material. He was thereby enabled to, and was the first who did, put on the market a strong and satisfactorily efficient portable insulated jar or can, of relatively large size. There was, of course, nothing new in having merely the outer and inner vessels, with a packing between; but both the face of the patent and a review of the prior art and the oral testimony, indicate that Blair's useful novelty, which is incorporated in several of the claims, and which we take to be the dominant characteristic of his invention, consisted in hanging the inner container to the outer shell at the upper extremity of each by a bond which was sufficient for this supporting function and which also served the essential insulating and sealing purposes. He was thus enabled to avoid relying upon the packing material for supporting the inner container from below, a function which it could only imperfectly

perform, and to avoid any extensive contact between the inner receptacle and the outer casing, whereby there would be any substantial channel for the escape of heat. Obviously, the use of a bonding material between the two, instead of having any mechanical direct union, gave opportunity for interposing a comparatively nonconducting material. So far as the record indicates, there is no material used by the plaintiff or by infringers, which is suitable for this bond, which is not also, in considerable degree, heat insulating.

Claim 1 is given in the note,[1] and is sufficient to indicate the limits of the controversy. For the outer and inner containers, the parties have not used any materials other than metal for the outer and a vitreous or glasslike material for the inner. There is nothing to show that the more generic terms, nonfrangible and frangible, have practically any wider application which might extend the field of prior use. The claim may therefore as well be read as if it called for containers that were respectively metallic and glassy.

The record leaves no doubt that Blair's *combination was new, and its utility is demonstrated by the large sales* and the adoption by infringers. The argument against validity is that all the elements were old, and there was no invention in putting them together. The earlier existence of the elements must be conceded; outer metallic casings used with an inner glass receptacle and with interposed insulating packing were old; metal and glass had been bonded together for some purposes and to some extent by material which would adhere to each; and an inner receptacle of bottle shape had been hung by its neck from the indrawn neck of an outer casing through mechanical direct contact. All these constructions had defects which apparently had prevented them, something had, from going into general use. The packing interposed between the outer and inner parts was certain to become, with use, somewhat denser, and to leave the inner imperfectly supported and subject to jar and breakage. If the inner receptacle had its neck extended out so that it would rest upon the outer casing, and might, e. g., be soldered thereto, a path was given for the escape of heat. By adopting

the plan of pendent support, Blair insured against failure of the interposed packing to support sufficiently, and by effecting this support by a bond between the two, rather than by a mechanical union, and by using for the bond this described material, or any other which has been found effective for that purpose, he at the same time gave support, prevented the escape of heat, and sealed out the air and moisture from the packing. Further, this method of bond support was mechanically more efficient and satisfactory than the other methods which had been tried.

The substantial character of Blair's step and its nonobviousness, are demonstrated by the testimony. The manager of a leading manufacturer of bottles of the thermos or vacuum type testifies that, when they realized the demand for larger receptacles, they tried to enlarge their thermos bottle, the "icy-hot," using its method of manufacture, and they found it impossible. The mechanical difficulties of handling hot glass in the manufacturing process, so as to produce a large and heavy receptacle, were insuperable. Thereupon, in the endeavor to make an article to compete with the Aladdin, then on the market, without adopting the pendent-bond-support, they tried the best plan they knew. They inserted between the two bottoms supporting springs, which would hold the upper one against vibration and compensate for any settling in the packing; but when they produced this article for the market, they found the best they could do was to maintain the temperature three or four hours, as against six or eight for the Aladdin. The manager says that for his own use he discarded his own and bought an Aladdin. The attempt to market this article was abandoned.

The manager at the time, of the McComb Company, one of Blair's chief early competitors and defendant in one of the Illinois cases, testifies in this record. The McComb Company began to make this nonvacuum type in 1921 (the Blair patent application was filed in 1919), and sold about 1,500 of its devices, which had an earthenware container supported at the neck by the indrawn neck of the metallic casing. There was no bond or seal; at least, not in any effective way. This form did not satisfy the market, after one season's trial it was abandoned, and Blair's pendent-bond-support adopted.

The record in the Monarch Case contains, in our view, most persuasive evidence that Blair's advance step was not one obvious to those skilled in this art. The Monarch Company was engaged for two or three years in

---

[1] A heat-insulated vessel of the nonvacuum type, having an outer jacket of nonfrangible material, an inner container of frangible material; said inner container being bonded to and pendently supported from said jacket, and heat-insulating and shock-absorbing means surrounding said container for limiting oscillations of said container while permitting expansion thereof by changes of temperature.

the effort to make a satisfactory article to meet the need for a larger and stronger "thermos bottle." Its mechanics, certainly skilled, tried several different forms, marketed some, abandoned them, and eventually came to and adopted Blair's pendent-bond-support form, a year or more after the Aladdin was on the market. A summary of this evidence is in the note.[2]

We thus find that in accomplishing this combination of old elements to make a new market article, there had been not only the delay of thirty or more years since the old patents now said sufficiently to teach the combination (though during most of this period there was no foreseen public demand for a thing of this kind), but there had been, after the demand was known, two or three years of effort by Blair's competitors to satisfy it by using their best skill in various combinations other than his, and we see that eventually one of them dropped out and the other two were compelled to use Blair's system of bond support for the pendent inner container. Seldom is there a record of failure by other things and success by the patented means, more helpful than this is, upon the issue of invention.

■ We do not overlook the problem presented by the form of the claim. The functions of the bonding material, as an insulator to interrupt the flow of heat and as a seal to exclude air and moisture from the packing, are not specified in the claim, although they are of considerable importance, we do not say vital, in distinguishing from the prior art. We think this patent is entitled to a fairly liberal construction in aid of its validity, and ought not to be defeated by any unnecessary adherence to technical rules. We think also that the always implied "substantially as described," and the doctrine of interpretation by the specifications, justify regarding the "bond" of the claim as one which does effectively insulate the outer and inner members. The patent specifies, in line 61 of page 1, that the bonding substance shall be of low heat conductivity, and the succeeding lines emphasize that it is to be incapable of transferring much heat or cold from one to the other. Its "non-heat transmitting properties" are again emphasized in line 115 of page 2. To import this limitation into the claim is not to bring in an additional element. It is only to interpret with the aid of the specification one of the words of the claim, so that it may not be thought so broad as to be destructive.

How far the sealing quality should also be implied in the claim in aid of its validity, it does not seem necessary to decide. Nor need we decide just what would or would not be the supporting bond contemplated by the claim. In defendant's form, the material of the bond is a sulphur composition. It is

[2] In 1918, the Monarch Company began its attempt to develop the non-vacuum type so as to get a relatively large container. It was without knowledge of Blair's idea. It used an ordinary Mason jar, packed in a casing with interposed insulation, and with a metal tube for filling and emptying, extended from the jar cover up through the open top of the outer container, and soldered thereto. There was thus (perhaps) the pendent support, but no combination of metal and glass, by such a bond or support by that bond, as Blair provided, and there was an obvious metallic channel for heat escape. About the same time the Monarch people made a second form, using an earthenware container with a neck and a metallic outer jacket conically drawn in at its neck and closely surrounding the projecting earthenware neck, but there was no attempt at insulation at this point between the two, or support of one by the other; but for this support the interposed packing material was relied upon. As this could not maintain resilience, the structure was certain to be inefficient as well as heat conveying. They planned to manufacture this on a large scale, but very soon discarded it. About July, 1918, they tried a third form, upon which, in December, they filed an application for a patent (later abandoned). This was like the second form just described, except that spring supports were interposed between the two bottoms to hold the inner container up in position (like the trial form experimentally produced by the "icy-hot"). This could hardly be satisfactory; the springs could not hold the inner jar motionless, there was no bond or seal at the necks, moisture and air would enter the packing material, and both the direct contact of the two necks and the lower springs would make troublesome heat conveyors. In March, 1919, they filed another patent application on a fourth and slightly different form. It lacked springs, but it had the other recited defects. They had not felt justified in trying to market any of these four forms. A fifth form, adopted October, 1919, was put upon the market. This was like numbers 3 and 4, except that they endeavored to avoid the heat escape at the contact point of the two necks by interposing a rubber gasket. There was no suggestion of bond or pendent support. There was a form of sealing by this gasket, but nothing to compel contact so as to make the seal effective. During 1919 and 1920, they marketed some 7,000 jugs of this type, of which nearly half were returned as unsatisfactory. In the fall of 1920, they substituted for number 6, form number 7. This was an elaboration of the rubber gasket idea. In addition, the inner jar was pendently supported at the neck by a screw thread engagement with the cap which was in contact with the outer container. Here again there was a heat losing contact between the inner and outer parts, and nothing resembling a supporting insulating bond between the two. As a sealing means, the rubber gasket was inefficient because it would be released whenever the cap was taken off. They manufactured and sold this form with some success for two years. Just at what time they had knowledge of the Blair construction does not appear, but in 1923, they abandoned number 7 and adopted the Blair idea of pendent-bond-support. They discarded their rubber gasket seal and separable two part form of the outer casing; they abandoned direct contact between the two necks, enlarged the outer one so as to get an intermediate space, and filled this in with a composition which was both bond and seal, and which caused the inner to be pendently supported by and from the outer.

strongly adherent, both to glass and metal. It seems probable that it would, unaided, sufficiently support the pendent receptacle; but its operation is aided by providing grooves in the outer surface of the inner and the inner surface of the outer necks into which grooves the bonding composition enters, and which grooves therefore aid in preventing any slippage as between the two members. This construction renders it less vital that the bonding material should adhere efficiently to smooth glass and smooth metal, as shown in the structure of the patent drawings; but the testimony of the experts that there is infringement is not disputed, we have no argument on the subject, and we think, for the purposes of this record, we should find that infringement exists.

The Seventh Circuit Court of Appeals relied upon three old patents as the most pertinent out of the many cited by defendant in that case, and expressed the view that in selecting elements from these three and combining them, as Blair did, there was no invention. Even if this were a case where the lack of invention could be spelled out in this way, the patents do not seem to us sufficient for that result. Clisbee No. 358,732, March 1, 1887, relates to a double wall metallic can for keeping coffee hot. The inner can is pendently supported by an upturned flange on its neck resting against the indrawn collar of the outer can, and the parts are screw-clamped together. There is no suggestion of bond or seal. The loss of heat from the direct contact of the two metal parts is obvious. The other two patents relied upon (Heath, No. 211,092, January 7, 1879, and Fox, No. 438,149, October 14, 1890) do not relate at all to heat insulation. They consist essentially of packing boxes to prevent the inclosed bottle from being broken in transportation. They do not have, in an effective sense, any bond or seal. Fox shows a wooden packing case for transporting a glass carboy. He furnishes support apparently only from below by an interposed packing. It is true that between the neck of the carboy and the surrounding hole in the top of the wooden box, Fox puts in plaster of Paris, and says that it is "to exclude water or moisture." There was thus the thought of a seal, but the proof is that plaster of Paris alone does not effectively exclude air or moisture, and that it would not adhere to the wood and glass so as to support the heavy carboy. It never was intended to give pendent support. Heath, likewise, who has only a bottle cased for shipping, and whose entire stated object was to prevent breakage, has no pendent support, and no bond or seal.

The leading decisions on the subject of invention are too familiar for citation. Their application depends on the facts of each case. We are constrained to the other conclusion from that reached by the Seventh Circuit Court of Appeals. It may well be noted that the testimony of two competitors, showing their unsuccessful efforts to get Blair's result by other means, was not in these McComb and Monarch records, and this proof is so important that it alone goes far toward justifying a different result here.

We have considered only claim 1. There are other claims which are broader in some respects and do not incorporate the supporting bond. They thus present questions of validity which we have not discussed. Some other claims are narrower and suggest questions of infringement. We see no object, upon this record, in considering any of these claims.

The decree will be reversed, and the case remanded, with instructions to enter the usual decree for plaintiff on claim 1, and without prejudice to any rights of the plaintiff under any other claim.