HOOKLESS FASTENER CO. v. G. E. PRENTICE MFG. CO.

No. 184.

Circuit Court of Appeals, Second Circuit.

Jan. 15, 1934.

Drury W. Cooper, of New York City, and Robert Cushman and Richard F. Walker, both of Boston, Mass., for G. E. Prentice Mfg. Co.

Charles Neave and Merrell E. Clark, both of New York City, R. S. Kelley, of Meadville, Pa., and Charles H. Walker, for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff owns United States patent No. 1,331,884, granted to it February 24, 1920, as the assignee of Gideon Sundback, for a sheet-metal forming and setting machine. According to Sundback's specifications:

"The machine illustrated herein is intended for forming the fastener members shown in my Patent 1,219,881, dated March 20, 1917, and affixing them to the corded fabric tape shown therein. The fastener members consist of separated jaws and an interlocking member having a recess on one side and a head on the other, these respective recesses and heads being arranged on a pair of tapes so as to alternately interlock.

"The machine of the present invention has for its object to form and set these fastener members on the tape with one handling of the material, and a further object of the invention is to enable the machine to automatically set these interlocking members in separated groups of a predetermined number each, so that the tape can be cut apart to provide fasteners of desired length.

"The present invention is not limited in its broad aspects to the production of the particular fastener members referred to, nor to the setting of such members on tapes, but is of general application wherever it is desired to automatically and cheaply form large numbers of like parts, and to set them on a suitable carrier element."

Into the Sundback machine a strip of metal, of the thickness of the fastener members to be made, is fed step by step. It goes through a punch press equipped with three punches. The operations of the machine will be described as a succession, although after the point is reached where the fasteners begin to be affixed to the tape, they occur simultaneously at each pause of the metal strip. The first punch cuts out the fastener unit by pushing it down into the hole in the die directly below it and at the same time cuts out a piece of the metal to form the jaws that will later hold it to a corded tape. When the punch moves up to its starting point the cut-out piece of metal is pushed back into its place in the strip by a spring in the die. The sides of the strip then act as holders and the strip as a carrier to take the unit under the second punch which pushes out a piece of scrap metal between the jaws. In the same way the unit is carried under the third punch which descends and pricks a little hole in the top of the unit. This causes enough metal flow to form a corresponding projection on the under side and gives to the unit its ability to act as a locking member in an assembled slide fastener. As these subsequent operations take place, movable guide plates press the edges of the strip firmly together to hold the fastener unit securely in the place it occupied in the strip before it was punched out and then brought back by the spring in the first die. These guide plates release the strip to enable it to take each forward movement. When the unit has been given the hole and nub by the third punch, it is moved forward by the sides of the strip, still acting as a carrier, until the jaws straddle the corded edge of a fabric tape. This tape is advanced at right angles to the plane of the carrier strip at exactly the correct speed and distance to present to the open jaws of each unit as they straddle the tape the exact spot where the unit must be attached to make an operable slide fastener. Then two side punches press against the outside strips of the metal "carrier" at points on each side opposite the jaws of the fastener unit. This force is transmitted through these sides to the jaws and serves to close them firmly over the corded edge of the tape without any direct contact between the side punches and the jaws. When one fastener unit has been thus attached the tape moves on just far enough to make room for another, and so these operations are repeated until a fastener strip of the desired length has been made. Then the mechanism which moves the tape carries it forward a predetermined longer distance before the next unit is attached. This leaves a length of tape free of fastener units between one group of fastener members and the next where the tape can be cut off to provide the desired length of fastener members and leave a free end to use in attaching it to whatever it may eventually furnish the means of closing and opening.

The tape is moved into position by means of a knurled feed roll over which it lies for such a distance that the tape does not slip on the roll but moves forward exactly as the roll turns. An oscillating pawl having a rather long stroke is used to turn the roll. For the normal step by step movement, which is used when the fastener members are being attached to the tape to form an assembly of units, the pawl is kept out of contact with its ratchet wheel by a raised guard plate until that last portion of the forward stroke which is just sufficient to advance the roll and tape the distance to present exactly the right spot on the tape to the jaws of the unit. The jump feed to give blank tape between assemblies is supplied by a supplemental pawl

which is advanced on the ratchet wheel each time the roll is given a normal step by step movement just far enough so that when the desired number of fastener members have been grouped on the tape it will have reached a point on the ratchet wheel where it will engage the main pawl and serve to advance the ratchet wheel, and consequently the knurled roll and the tape, the entire length of the next stroke of the main pawl. Then the normal step by step feed occurs until the supplemental pawl gets around on the ratchet wheel again to engaging position with the main pawl. This mechanism is adjustable to provide fastener strips of variable lengths.

The fastener unit as such is not an issue in this case. This patent is only for the machine which makes and assembles them in groups on a tape. Inventive ability of no mean order was required to produce it. Although slide fasteners had been known for many years and the Kuhn-Moos fastener, which is the forerunner of the type used by both the plaintiff and the defendant, was patented in England in 1912 (British patent No. 14,358; not patented in this country), no machine was produced to make and attach such slide fasteners to tape automatically until that of this patent. The units are so small that it is difficult to hold them rigidly in position during the process of manufacture to make them so like one another that they will interlock and hold as a fastener that can be opened and closed easily by moving the slide member. They have to be so positioned on the tape that they will not get materially out of alignment though the tape may stretch a bit and any group of units on the tape has to be interchangeable with other like groups so that any two such assemblies will work together as an operable fastener when the lengths of tape are attached to the opposing sides of whatever opening is to be fitted with that means of closure. And as there must be repeated opening and closing, the fastener strips must coact with considerable precision in operation throughout the life of the fastener.

The defendant uses a machine which makes a slide fastener so like the plaintiff's that the ordinary person cannot tell them apart. Its machine, however, does not bear the same resemblance to the plaintiff's. A similar strip of metal is fed into a punch press where the first operation is to prick a hole in the top of the strip and displace the metal at the underside opposite the hole to form the projection which supplies the same fastener means, by interlocking the hole and nub, which is found in the plaintiff's fastener units. Then a step by step movement carries that part of the strip under a punch which descends and cuts out the fastener member similar in shape to the plaintiff's though the edges are straight while those of the plaintiff's units are slightly beveled. When the defendant's unit is pressed down into the hole in the die below, it is not pushed back, however, but is carried down to a lower lever where it is brought into contact with a slide which moves it forward until the jaws straddle the corded edge of the tape. Then the slide member engages rocker arms on either side which pinch the jaws onto the corded edge. This tape is moved step by step just enough to provide a space for units to be attached in groups of desired length and then a jump feed gives the blank tape between groups necessary for cutting them apart and attaching them to openings to be fitted with such fasteners. The tape feed mechanism consists of the knurled roll which moves the tape without slipping as far as the outer surface of the roll is advanced. The normal advance of the tape for attaching the units closely together is provided by reduction gears in contact with the shaft of the roll which do not, however, prevent the shaft being driven forward at greater speed periodically by a jump feed mechanism. When the jump feed is desired to put a blank space between groups of fasteners of predetermined length, it is obtained by means of a pawl and ratchet wheel. The ratchet wheel is fitted with notches spaced to give the jump feed at certain intervals as desired and may be replaced with another with notches differently spaced to change the relative position of the jump. The jump feed is also adjustable by altering the throw of the pawl.

Claims 1, 36, 37, 40, and 42 are relied on. The plaintiff did rely on claims 34 and 38 also, but they were held void in the District Court and no appeal was taken.

Claim 1 reads: "The combination of means for cutting a flat member having separated compressible jaws at one end, means for forming a recess and head on the other end, means for feeding the jaw end astride a carrier, means for feeding the carrier, and means for pressing the jaws together on the carrier."

It is readily seen that the claim is verbally of such breadth that it may read on the defendant's machine although it does not cover the jump feed element. Whether it can be given its apparent breadth and be valid depends upon the scope of the patent, as disclosed in the specifications. While a claim

cannot be enlarged by interpretation in the light of the specifications, since a patentee is free to claim only such portion of his disclosure as he desires and cannot hold what he fails to claim, the language of a claim will be read, when necessary to save its validity, with the implied limitation that it covers only what is substantially as described. Mantle Lamp Co. v. Bowman Co. (C. C. A.) 53 F.(2d) 441; Smokador Mfg. Co. v. Tubular Products Co. (C. C. A.) 31 F.(2d) 255. If this claim is held to the means disclosed for making slide fasteners, there is nothing in the prior art which can be fairly said to be an anticipation. When so limited it is valid, but its scope is so narrowed that the defendant's machine does not infringe. It has no means for forming a recess and head on the end of the flat member opposite the jaws after the unit has been formed. It has no way to hold the little piece to do this after it has been struck from the strip of metal. It does not make use of the waste side pieces of the metal strip as a holder and carrier, but uses the "cut and transfer" method instead. To be sure the only difference in respect to the formation of the interlocking means is that the defendant's machine makes the hole and recess in the strip before the fastener unit is punched out and were the patent entitled to a broad range of equivalents that difference might be said to be unreal.

As will be seen from a portion of the specifications above quoted, Sundback stated that his invention was not limited in its broad aspects to the particular fastener members mentioned nor to setting them on tapes "but is of general application wherever it is desired to automatically and cheaply form large members of like parts, and to set them on a suitable carrier element." The judge who heard the case below took the view that the inventor in this way said no more than that his invention covered "a machine adapted to manufacture not only the particular device of his prior patent, but also any similar slide-fastener device." It is, indeed, possible so to construe the language by taking the words "like parts" to refer to parts like the fasteners of the prior patent rather than to mean any parts which are similar one to the other and are to be set on a carrier element. But this language was chosen by the inventor and made by him a part of his contract with the government. Liberality of construction does not go to the point of permitting him, or in this case his assignee, to fix the scope of the patent in the way most advantageous to meet the exigencies of the present suit by giving to his language, the one of two equally possible meanings which is for the present most favorable. Parker v. Sears, 18 Fed. Cas. page 1159, No. 10,748. It must be construed in accordance with rules of construction applicable to contracts generally. Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 26 L. Ed. 149; Kelly Well Co. v. Kirschke Concrete Well Co. (C. C. A.) 14 F.(2d) 274. And language of doubtful meaning is to be taken most strongly against the one who used it. Stipcich v. Metropolitan Life Insurance Co., 277 U. S. 311, 48 S. Ct. 512, 72 L. Ed. 895; Greenbaum v. Columbian, etc., Co. (C. C. A.) 62 F.(2d) 56.

Moreover, the statement that the invention is of "general application" in making "large numbers of like parts" and in setting them on a "suitable carrier element" is certainly a curious way of saying no more than that the invention covered the making and setting of the fastener members named and of similar fastener members. We think more was intended. As has already been said in Colonial Fastener Co., Ltd., et al. v. Lightning Fastener Co., Ltd., [1933] Ex. C. R. 363, in a suit on the Canadian patent covering the plaintiff's machine, this United States patent is not limited to a machine whose product need be fasteners at all for "the units need not be fastener units, and the carrier need not be a tape, but may be any suitable carrier element." So the field of infringement was not limited to machines which manufacture fasteners in the way the plaintiff's machine does. And the field of prior art to which resort may be had to determine validity is as broad as the field of infringement. Jackson Fence Co. v. Peerless Wire Fence Co. (C. C. A.) 228 F. 691, 694. Compare Miller v. Life Savers (C. C. A.) 62 F.(2d) 513. We may and should, therefore, turn to the prior art for machines which make "large numbers of like parts" and "set them on a suitable carrier element," though they do not make fasteners.

Barbed-wire machines do that. The patent to Brainard, No. 292,467, January 29, 1884, disclosed a machine into which a strip of flat metal was fed step by step from which barbs were formed (i. e., "large numbers of like parts") and attached to a wire (i. e., set on a suitable carrier element). Brainard used a punch press with three punches; a step by step ratchet and pawl feed; a guide way to hold the flat metal strip in position to permit punching out of the barbs and forming them to shape; a means for pushing the formed barb down to straddle the wire and then to

clinch what may be called its jaws over the wire which was fed along to space the barbs on it equi-distant from each other. Another patent which shows a somewhat different machine for making and attaching barbs to wire to get substantially the same result is that to Stover, No. 240,477, April 19, 1881. Clow's barbed-wire machine, patent No. 361,928, April 26, 1887, is another variation of what was an old process when the application for the plaintiff's patent was filed. Clow took barbs already formed to the shape of a staple and attached them to a wire. For the disclosure of a much more intricate machine which also made many like parts and attached them to a carrier in another way, the Major patent, No. 525,914, September 11, 1884, for a machine to make hooks and eyes and attach them by staples in groups to a paper strip, is of interest. Yet the prior art also dealt with fastener stringers for use in making slide fasteners. Aronson's Canadian patent, No. 107,456, September 17, 1907, was for a machine which attached metal fastener units by clamping their jaws over the edge of corded tape. These units were first formed on another machine and then placed in magazines in groupings which would leave the desired spaces on the tape between sets of fasteners. The magazines were then fed into the machine. The jaws of the units pointed upward from the magazines and as the corded tape was advanced step by step over them, pinchers just above the magazine grabbed the tape and pushed the corded edge down between the jaws which were then clamped upon it by two reciprocating plungers. Then the tape was released and moved forward to bring a new portion into position for unit attachment. Aronson's machine was far short of the plaintiff's in utility 'and had little in common with it but it did produce a slide fastener stringer by putting the units in groups spaced as desired on the edge of a corded tape. Of course, in so far as the machine was a punch press it was not invention to fit it with punches and dies to make these units. Karron v. Karron (C. C. A.) 66 F.(2d) 785. But enough already appears to compel us to hold claim 1 to the means substantially as disclosed in order to give such a broad claim validity. Accordingly, we do that and consequently must hold that the defendant's machine does not infringe claim 1.

Claims 36, 37, 40, and 42 all are tied to the means for hastening the movement of the tape at desired intervals to produce the blank spaces between groups of attached fastener elements. The way the plaintiff's machine does this and the way the defendant's machine accomplishes the same result has been outlined.

A jump feed movement brought about by using a pawl with an adjustable throw making contact with notched ratchet wheels that in turn drive rollers through which strip material is fed at regular and then irregular distances, as predetermined by regulating the pawls and ratchet wheels, is very old. The patent No. 85,249, December 22, 1868, to Shipley shows as much in a machine which was a step by step feed punch press for making combs. The Major patent already referred to in connection with claim one has a jump feed which makes use of a ratchet and pawl method which differs in no material way from that of the plaintiff's patent. Both claims 36 and 37 contain a clause reading "means periodically varying the strip feed to group the spaced members." In this respect they are anticipated by Major and by Shipley. Claim 40 combines means for affixing groups of members to a strip and means for strip feeding with "means for feeding an increased length of strip between groups, and means for regulating the number of members in a group." This claim adds nothing not in claims 36 and 37 in respect to the jump feed except the "means for regulating the number of members in a group." Shipley disclosed such means although he was concerned with teeth in a comb rather than with groups of independent units which were attached to a carrier. We need not say that cutting out teeth from a strip of material in spaced relation to each other is identical with attaching groups of units to a carrier strip of any kind. Even this feature of the claim, if not anticipated by Shipley, was by Major.

Claim 42 combines the jump feed elements with means for affixing units on the "edge" of the carrier. Of course, the Major machine did not affix anything to the edge of the carrier. This difference cannot be said fairly to distinguish this claim from the others last mentioned, however, for there is nothing whatever that is new merely in attaching units to the edge of a carrier tape. Aronson did just that and did it in making slide fasteners. Nor need the slide fastener field of the prior art be left to point out that the old Kuhn-Moos fastener members were also attached to the edge of the tape.

Yet in all these claims this jump feed movement is combined with means for affixing either a member, or groups of members, to the tape. For the reasons already stated in sustaining claim 1, such means should be,

and are, held to what that claim covers. So limited these claims cover a new combination and are valid. H. Ward Leonard, Inc., v. Maxwell Motor Sales Corp. (C. C. A.) 252 F. 584; Ottumwa Box Car L. Co. v. Christy Box Car L. Co. (C. C. A.) 215 F. 362. But this element of the combination is not found in the defendant's machine, and consequently none of these claims are infringed. American Chocolate Machinery Co. v. Helmstetter (C. C. A.) 142 F. 978; Underwood Typewriter Co. v. Royal Typewriter Co. (C. C. A.) 224 F. 477; McMurray v. Mallory, 111 U. S. 97, 4 S. Ct. 375, 28 L. Ed. 365; Knapp v. Morss, 150 U. S. 221, 14 S. Ct. 81, 37 L. Ed. 1059.

Decree reversed.