## THOMPSON et al. v. WESTINGHOUSE ELECTRIC & MFG. CO. et al.
### No. 36.

Circuit Court of Appeals, Second Circuit.

Dec. 30, 1940.

Irving Seidman, of New York City, and Allen T. Dresser, of Boston, Mass., for appellants.

Drury W. Cooper, John C. Kerr, and Allan C. Bakewell, all of New York City, and Walfrid G. Lundborg and Shipman & Goodwin, all of Hartford, Conn., for defendants-appellees.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

Frank W. Thompson, the patentee and the owner of U. S. Patent No. 1,695,302 for an electric heater which was granted to him on December 18, 1928, on his application filed April 12, 1922, and the Electro-Thermal Machinery Company, alleged, though not proved, to be the exclusive licensee under the patent, brought the suit in equity in the District Court for the District of Connecticut against the defendants for the infringement of claim 32 of the patent. After hearing, the trial court dismissed the bill for noninfringement and this appeal followed.

The defendants United Aircraft Corporation and Chance Vought Aircraft Corporation, which is a division of United, were charged with infringement by using in Connecticut the patented method of heat treating metal in spot welding airplane parts. The defendant Westinghouse Electric and Manufacturing Company is the manufacturer of a timing device, called an Ignitron Timer, which the other defendants used to control the electric current flow in their spot-welding and is alleged to be a contributory infringer.

The patent specifications describe the invention at length and illustrate in rather minute detail the application of it to forging though that is only by way of showing one of its principal uses and is in no sense a limitation. It serves well to show, however, that the main objects of the invention were to heat electro-conductive metal blanks, whether they were of uniform or of irregular cross-section, to a uniform temperature or to any number of temperatures and to hold them at any desired temperature until they were removed to be processed. This was done by using electrodes of opposite polarity, designed as disclosed, which were pressed against the metal in such a way that as the current passed through the blanks their resistance would cause their temperature to rise and yet the blanks, upon becoming comparatively soft when heated to any temperature below their melting point, would not be deformed by the pressure of the electrodes. And to bring into his method of electric heating a desirable element of versatility the patentee disclosed an automatic way to heat electro-conductive blanks to a predetermined temperature at one rate and then, at a different rate, to let them heat or cool to the temperature finally wanted and then to hold them practically at that temperature for such time as desired or to hold them substantially at the temperature first reached. In doing that he used what he called in his specifications "a method of controlling electric circuits in response to a change in the resistance of an article being heated resulting from a change in the temperature of the article" although he did, as will be seen, suggest the use of controls responsive not to resistance changes but only to the passing of predetermined intervals of time.

Not much of what the specifications contain is of prime importance on this appeal for the defendants use only one electric circuit; do not use a circuit changer; do not heat at differing rates; do not use the specially designed electrodes of the patent; and do not maintain any fixed temperature after heating to permit further processing of the metal. Instead of heating a blank preparatory to its removal for fabrication into whatever is wanted, they quickly heat two pieces in a series of spots to a temperature at which they fuse at the spots; thus doing away with the use of rivets or the like for holding the pieces together. In so doing it is desirable to avoid arcing

which will cause sparks and so there has to be an accurately timed sequence in operation to have the circuit open both when the electrodes are put in contact with the metal and when they are taken from it. That sequence is as follows: The electrodes close upon the material to be welded; then the current is turned on to heat the portion which becomes the weld; and then the current is turned off before the electrodes are disengaged. Spot welding was old in the patent sense when Thompson made his invention and this sequence of steps was equally old in the art. What is said to be new and covered by claim 32 is the method of combining time control of current with the control of the sequence of the steps in operation. It is contended that this is what claim 32 should be read to cover and what the defendants do to infringe.

As what they do may as a matter of language come within the claim, in order to determine whether they infringe it is necessary to consider in more detail the patentee's disclosed method of heating and maintaining heat in his blanks. He showed a transformer, connected to a suitable source of current, with two primary windings; a secondary winding and a circuit changer controlled by a solenoid and dash-pot for changing from one primary to the other. It is important to note that much of the patent deals with the heating of blanks of irregular cross-section to predetermined temperatures and the subsequent holding of a temperature regardless of the time required, and it is only in the special instance where like blanks are to be heated that anything is said in the specifications about time control of current flow and then only in connection with the change from one primary to the other. After stating the obvious fact that his circuit changer might be operated by manually actuated switches "or the same or a different circuit changer might be operated by entirely different mechanism" he said that as "a series of identical bars A will reach a predetermined temperature and therefore cause a predetermined increase in the resistance of the work circuit and consequent decrease in the current flow in the primary circuit and through the solenoid in the same time interval", the solenoid and its dash-pot, being directly responsive to the current in the primary of the transformer, could be used "for operating the circuit changer" at a predetermined time after the circuit had been closed by putting the piece to be heated between the electrodes. And following that is all that can be found in the specifications upon which to give the language in claim 32 a construction that will at the same time bring it within the disclosure and serve to cover.what the defendants do in their spot-welding. In this respect the patentee said: "Such being the case, it will be apparent that for the particular means previously described (solenoid and dash-pot) to control the operation of the circuit changer there might be substituted time control means such as clock work or escapement devices to control the time during which the circuit through primary winding $P^2$ is maintained closed".

What is called primary $P^2$ is a winding having a smaller number of turns than his other primary $P^1$ and because of that a stronger current is induced in the secondary by it than by $P^1$ and consequently there is more rapid heating of the work-piece. What the patentee said in the part of his specifications just referred to means that when a series of identical bars are to be heated the heating period required by the use of $P^2$ could be determined and a clock work or escapement timing device could be used to maintain that circuit closed for the required time before the circuit changer replaced $P^2$ with $P^1$. It was at most only a disclosure of an alternative way to control his circuit changer to replace a current flow of one kind with a current flow of another. His only absolute discontinuance of current flow occurred when a work-piece was removed from his heater.

Claim 32 is in broad general language as follows: "The method of heating a work-piece employing a work-circuit, means for conducting an electromotive force derived from the work-circuit to establish a current to heat the work-piece, and means operating automatically upon the elapse of a predetermined time interval from the application of the electromotive force to discontinue said work circuit and sequently disconnecting the first mentioned means to effect release of the work-piece".

When read upon the specifications this claim may well be valid for the discontinuance of the work circuit "upon the elapse of a predetermined time interval from the application of the electromotive force" may be held to the circuit changer control but if, as is necessary to make the claim cover what the defendants do, it must be read to cover the automatic shutting off

of the entire work-circuit upon the elapse of a predetermined time it goes beyond the disclosure and beyond what could be new in view of the prior art except in respect to the construction of the timer as to which the specifications say nothing at all.

█ Heany's Patent No. 1,061,378, issued in 1913, shows an electric spot-welder having two contacts in a rotary switch which could be so positioned that the welding time could be controlled by the speed of rotation of the shaft. That was a time control of current flow and, though it may not have been absolutely accurate because of unavoidable variations in shaft speed, it was an adaptation of the timing principle to spot-welding and broadly to the kind of metal heating to which the patent in suit relates. Combined with automatically timed current control was the needed sequence of steps in operation to spot-weld. That, too, is found in another form in Patent No. 1,074,383 issued to Rietzel in 1913 for an apparatus designed to do seam welding. And in the Carter Patent No. 1,147,783, issued in 1915, a method of electrical heat treating of metal is shown with current control either by foot lever or a power driven rotary shaft actuating the necessary switches. The defendants also proved beyond a reasonable doubt, and the court found, that long before Thompson's invention welding machines having time control of heating coupled with sequence control of steps had been in commercial use by the General Electric Company at Schenectady, N. Y., at Lynn, Mass., and at Cleveland, Ohio. That kind of proof made those machines a part of the prior art. Coffin v. Ogden, 18 Wall. 120, 124, 21 L.Ed. 821. And for present purposes it is of little moment that their timing was obtained by the operation of switches actuated by moving parts which perhaps did not throw them always at the same split second because of variations due to motor speed, belt slip and the like. They serve to show that the method was well known and Thompson could enter the patentable field in this respect only by disclosing a new adaptation of the old principle embodied in a useful device. He stopped short of doing so by means of "clock work or escapement devices" when he merely mentioned them as possible means for control without explaining in any way how they could be made a part of his method. If the way so to use them was obvious, their substitution for other controls would not amount to invention and, if not, the mere expression of the opinion that they could be used without showing the way to do it added nothing patentable to the specifications since ideas in the abstract cannot be patented. Westinghouse Electric & Manufacturing Co. v. Toledo, P. C. & L. Ry. Co., 6 Cir., 172 F. 371.

█ As no commercial use has been made of the patent in suit it should, though good for what it clearly does cover, not be expanded beyond that. Dernell Potato Products Co. v. Snelling, 2 Cir., 38 F.2d 788; Cocks et al. v. Rip Van Winkle Wall Bed Co., 9 Cir., 28 F.2d 921. And the claim must be read not to discover merely whether it verbally covers what the defendants have done but whether it does when construed in the light of what was actually disclosed. Grubman Engineering & Mfg. Co. Inc. v. Goldberger, 2 Cir., 47 F.2d 151; Baker Perkins Co. v. Thomas Roulston, Inc., 2 Cir., 62 F.2d 509; Electro-Dynamic Co. v. United States Light & H. Corp., 2 Cir., 278 F. 80.

█ So the automatic means of claim 32 which discontinues the work circuit after a predetermined time interval must be held either to refer to the cutting out of one primary when the circuit changer cuts in the other or to the final discontinuance of current through the work-piece when it is removed from electrodes. If it be the former the defendants do not use that element of the claim since they have but one circuit and no circuit changer. If the latter, and that is impossible because there is nothing automatic about it, they do not use the disclosed means for discontinuing the work circuit for they cut that at the primary to stop all current flow to the secondary before the work-piece leaves the electrodes, making the secondary then dead and unable to cause sparks, while the patentee discontinues merely by breaking the work-piece connection between electrodes to break the secondary circuit.

Granting that the defendants' use of the Westinghouse "Ignitron Timer" is the use of timed control of the current circuit in accordance with the elapse of predetermined time intervals and that there is a controlled sequence of steps in operation which would come within the broad language of claim 32, no infringement was shown because the defendants do not practice what Thompson disclosed as his invention. They use a machine in which the single primary circuit is turned on after

the work-pieces are placed between the electrodes by pressing a foot pedal and then the apparatus goes through its cycle automatically and with great rapidity to make weld after weld which so far as any heat treatment is concerned are finished processes as soon as the circuit opens after each weld. There is no maintenance of temperature beyond the first application of heat to the fusing point and so no use of any part of Thompson's invention for such heating.

The necessity for reading the broad language of claim 32 upon the specifications makes it impossible to read it upon the spot-welder of the defendants.

Decree affirmed.