PENNINGTON ENGINEERING CO. v. HOUDE ENGINEERING CORPORATION.

No. 103.

Circuit Court of Appeals, Second Circuit.

May 21, 1943.

Luther Day, Leslie Nichols, and Ray S. Gehr, all of Cleveland, Ohio, and Max D. Farmer, of Buffalo, N. Y., for plaintiff-appellant.

Charles W. Hills, Jr., and Alexander C. Mabee, both of Chicago, Ill., and Popp & Popp, of Buffalo, N. Y., for defendant-appellee.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

This is the usual suit in equity for the infringement of three claims of a patent; enlarged in scope by allegations of a cause of action based upon the use without the plaintiff's consent of an invention which the plaintiff disclosed in confidence to the defendant. In the court below the plaintiff at first prevailed upon both phases of the case but upon rehearing a decree was entered dismissing the bill on the merits and from that the plaintiff has appealed.

We shall take up first the issue on the claims of the patent. The plaintiff is the owner by assignment of United States Patent No. 2,009,677 which was granted on July 30, 1935, to Gordon P. Pennington for a "Shock Absorber for Motor Vehicles." It alleged infringement of claims 18, 27, 28 and 37 by three of the defendant's shock absorbers but withdrew claim 18 before trial. The defendant is, and for many years has been, a large manufacturer of hydraulic shock absorbers under the Houdaille patents which first disclosed a successful way to adapt this principle to automobile use.

As is well known, shock absorbers have long been installed between the body and the axle springs of automobiles to prevent the rebound of the springs after they have been compressed by road bumps or otherwise and sometimes such absorbers have been of the double action type which somewhat check the compression as well as the rebound of the spring. That feature, however, has no present significance. Shock absorbers for automobiles have been of at least three principal types—the friction, the snubber, and the hydraulic. We are now concerned only with the last mentioned kind in the designing of which Maurice Houdaille of France was a pioneer. He used a swinging piston of the double vane kind and the defendant has always used that type of piston and did so in building the accused devices. That fact is of the greatest significance on the question of infringement as will later be seen. The specifications of the patent in suit show that the patentee deliberately selected the single vane swinging piston type of hydraulic shock absorber as the one to which his improvements were primarily, if not wholly, directed. He thereby secured for his shock absorber some advantages in operation which need not be set out now in detail since they are presently immaterial and at the same time took over some disadvantages which for the same reason need not be mentioned further. He also had to face certain manufacturing difficulties which one making the double vane piston type of the defendant did not encounter. Those difficulties and the reasons for their existence will have to be dealt with at some length for it is in the overcoming of them that the patentee displayed invention, if he did at all, and unless the defendant made use of those features there is no infringement.

The hydraulic principle utilized in these shock absorbers is of course old and the adaptation of it to this use may fairly be said to be out of the ordinary only in the following respects: The devices had to be small in size; to be able to cushion comparatively heavy shocks; to withstand repeatedly the high internal pressures so required and to do without much maintenance attention; and to be manufactured at a cost low enough to meet competition successfully. Had size and cost been negligible factors doubtless anyone who could qualify as a hydraulic engineer could have contrived what was needed to put the hydraulic principle to work to level out the rebound of an automobile spring.

To care for the sudden heavy loads they would have to carry, the pressure chambers in the shock absorbers had to withstand pressures around, and at times exceeding, two thousand pounds to the square inch, which may be compared somewhat roughly to putting a ton upon a support the size of a quarter. That put a corresponding strain upon the working parts and all the joints through which the fluid used might leak. As was well known when the patentee filed his application, a good hydraulic shock absorber had to have its pressure chamber or chambers kept full of fluid by the automatic replenishment of that; to have what fluid was squeezed out in operation trapped and put back automatically into use; and to have means for releasing whatever air might get into the pressure chamber since that would tend to emulsify, and destroy the usefulness of, the liquid.

The general way in which a hydraulic shock absorber works, no matter what kind of piston is employed, need be but briefly told. The energy stored in the spring when it is compressed is transmitted through a suitable link to the shock absorber. Whether it is there carried to the housing or to the piston is but a matter of designer's choice. In either construction the force so carried moves the housing or the piston to squeeze fluid within the shock absorber between the piston and the walls of the compression chamber. As the fluid in the chamber is non-compressible—usually oil or glycerine—there must be some way for it to escape to let the movement mentioned take place and, of course, this movement is necessary to let the automobile spring resume its normal position. That is accomplished by putting in a small passageway fitted with a suitable one-way valve that lets the liquid escape from the part of the compression chamber which is ahead of the advancing vane or the housing-carried abutment and go into another space where it will serve again in the same way. The size of this passageway sets the amount of relief from the piston which is permitted and that determines the shock absorbing efficiency of the device. As will thus be seen, what happens is the transfer of the energy in the compressed spring into heat which is dissipated into the air. This efficiency of the shock absorber obviously may be predetermined and built into it. Maintaining it without undue attention required a rugged construction not easy to make and assemble as inexpensively as was desired and it is in the solution for the single vane piston type of the problems involved that the patent disclosed invention if it shows any at all.

What has been called the pressure chamber has up to this point both included the entire cavity within the shock absorber which is filled with oil and that portion of it which has for one of its sides only the vane of the piston when that moves or the abutment moves toward it. From now on it will be easier to understand what the patent covers to think of the pressure chamber as a space enclosed by a top and bottom member each carrying a smooth surface which is parallel to the other and against which the swinging vane of the piston fits so perfectly that one of its sides clears the top member and the other the bottom without permitting the passage of oil enough to interfere with the proper working of the device. As the vane swings, the outer wall at its end must of course be round and fit the end of the vane with the same degree of closeness that the top and bottom pieces fit its sides respectively. And in the single vane type there must be a similar fit between the rounded wall and the base of the vane where it becomes a part of the shaft at that point. All this of course required precision in manufacture to attain the desired result and that had a direct bearing on the production cost which had to be kept down. Moreover, some leakage through joints while the absorber was in use was inevitable and that had to be trapped.

In addition the patentee was by his choice of the single vane type presented with a difficult problem of assembly. In using a single vane piston he necessarily had to have his piston carried by a bearing at, or near, one of its ends. That meant a bearing which would withstand the lateral thrusts bound to be set up and that in turn required not only initial alignment but initial strength and rigidity in all co-acting parts to maintain alignment and prevent binding with its resulting wear and perhaps untimely destruction of the absorber.

Perhaps all this would have presented no great difficulty had the need for a low manufacturing cost not been so important. Since it was, however, machine operation was required to a large extent. It would have been old and easy to have reamed out a metal cup as the defendant had long done and then the needed partitions called abutments could have been put in separately. Such abutments had been put into a metal cup by previous makers of hydraulic shock absorbers in various ways. Perhaps the most common was the insertion of a metal slide into slots and fastening it there. Usually it was pressed in and into a bed of softer metal which served to make the joint tight. That construction had proved to be workable but the patentee discarded it and put into practice his own ideas. What he did seems not to have been anticipated and to have been at least very close to invention. What he did will have to be described in order to deal adequately with the subject of infringement but as we agree with the trial judge that no infringement was proved we will not pass upon the validity of the claims in suit.

The patentee who was an engineer of good training and experience especially in hydraulics elected to make his shock absorber housing of three parts to which he added a fluid trap that will be left out of account until later. His election to use a three part construction for his housing grew out of his perception that by so doing the member carrying the abutments needed in the pressure chamber could be broached out. He could in that way obtain abutments integral with the outer peripheral wall as well as the cheapness of a machine operation. Admittedly broaching was an old art to which the patentee contributed nothing. All that was needed was a broach of the proper size and shape to get his result and it was, of course, a good one. But as so often happens it was obtained at a price. If a metal cup was reamed out the peripheral wall and the bottom would be integral though there would be no integral abutment. That too had its advantages. They were, of course, a bottom part immovable in respect to the peripheral wall and no joint whatever between the two. These were both important features, and especially the immovability as will presently be seen, for the bottom part carried a bearing for the piston vane's hub and if that moved but a little the hub would pinch and wear. It would then be spoiled eventually to say nothing of the fluid leakage which would come about with the change of the vane's position relative to the sides of the casing when and if wear produced the change.

This hub of the patentee's piston-vane had to have its other bearing in the top, or third, member of the housing and might extend out through a hole in the fluid trap member tightly packed to prevent fluid leakage at that point. This brought up a dual problem which though akin to what has been mentioned was also in addition to it. It was dual in that it involved not only the initial bearing alignment through all three parts of the housing and perhaps the side of the fluid trap too but the building in of permanent rigidity to keep these parts in place. And in this respect, as in every other, it was necessary to simplify the operation to keep manufacturing costs down.

Here again the inventor showed at least great ingenuity. He saw that what was needed was a method of assembly that would guide the parts into their proper relative position as they were put together, and hold them there. He solved this two-fold problem (1) by drilling what might be called offsetting holes in the back plate and in the front plate for cap screws and dowel bolts which he selected as the means for holding his three part casing together. These holes have been called offsetting because he drilled them as follows: The bolt holes about 1/32 of an inch under size and the screw holes in the front plate about 1/32 of an inch over size. The screw holes in the back plate were drilled to size and tapped. He then (2) assembled the three parts of his casing by using what he called an "assembly plug." After having first put the back plate in a fixture which positioned it in relation to the bolt holes, he bored out the rear bearing recess in which he fitted and finished a bushing. He machined the bearing in the front plate in the same manner and then put the abutment carrying part in a fixture which positioned it with respect to its broached surfaces. Then he drilled the bolt holes and the screw holes in this member; making the bolt holes about 1/32 of an inch under size and the screw holes about 1/32 of an inch over size. Now the three separate casing parts were ready to be assembled and what had to be done may well be quoted from the specifications: "Next the three casing parts 1, 2 and 3 are assembled and secured rigidly together upon what I term an assembly plug which is similar to the combined piston and shaft of the shock absorber except that the vane or piston part is made of a circumferential extent great enough to substantially fill the working chamber of the shock absorber and that the plug is made of such a size that its bearing surfaces which engage the peripheral surfaces $2^a$ and $2^b$ of the casing part 2 fit the latter with a smaller clearance than do the corresponding surfaces of the piston. This assembly plug, being made very accurately, serves to very accurately position the surfaces $2^a$ and $2^b$ of the intermediate casing part in relation to the shaft bearings of the casing parts 1 and 3. The drilled holes of the three casing parts are then brought into alignment with each other by inserting a pin through one of the sets of holes and then while the three casing parts are clamped rigidly together the dowel bolt holes are brought to their final finished size by reaming, the bolt holes in the back plate 1 being preferably finished to a somewhat smaller size than the bolt holes in the other two casing members so that the dowel bolts when they are in-

serted in the assembled casing will have a heavy pressed fit in the back plate that will insure a leak tight joint or engagement between the bolts and the said back plate. With the casing parts thus machined, it is obvious that when the shock absorber is assembled the insertion of the dowel bolts will position the three casing parts with a high degree of accuracy in their proper relation to each other."

The patentee equipped his casing so assembled with a fluid trap made of a cup-shaped member which went over the top piece of the casing and extended just beyond the joint the intermediate or abutment bearing piece made with the bottom piece. Then its edge was fastened to the casing in a fluid-tight way. Thus any possible leakage from the casing would be caught in this cup-shaped member which provided a storage chamber from which the fluid was automatically put back into the pressure chamber by a method not here in controversy.

Having acquired the patent, the plaintiff made up some hundred shock absorbers and attempted to interest some fifteen or so makers of automobiles or automobile accessories in addition to this defendant before the latter was approached for that purpose. It had succeeded in getting the device approved by the Chrysler Corporation and the Lincoln Division of the Ford Motor Company but had sold no shock absorbers and so far as appears it never did sell any.

It was at this stage that the events occurred which lead to that part of this action which charges the unauthorized use by the defendant of the invention disclosed to it in confidence.

The patentee who was then the president of the plaintiff corporation gave a thirty-day option on the device to a Mr. Parker. The latter knew a Mr. Girl in Cleveland, Ohio, who was a brother-in-law of Mr. Getler one of the defendant's vice-presidents. Mr. Girl became personally interested in the option from which he would have benefited financially if Parker could have made a profit on it. Girl, who was also one of defendant's stockholders, told Getler as much and arranged to have the latter come to Cleveland with his engineers to meet Pennington and Parker and be shown the shock absorber. The meeting took place on January 19, 1931, when representatives of the defendant inspected the shock absorber which was ex-

plained to them by Mr. Pennington. A few days later Mr. Girl was informed by his brother-in-law that the defendant was not interested in it, and nothing more ever came of the attempt to dispose of it to the defendant. The application for the patent in suit was pending before the defendant was approached concerning the Pennington shock absorber and there is no claim that more was disclosed in confidence to the defendant than was included in the specifications in the application for that patent.

It was after this meeting in Cleveland that the defendant manufactured and sold the accused shock absorbers and it is necessary in order to present the question of infringement properly to describe what the defendant had been manufacturing and selling in large quantities before Pennington undertook to invent his shock absorber. It had been for years one of the largest manufacturers of hydraulic shock absorbers for automobiles and a while before the Cleveland interview one of the models it made had been adopted as regular equipment on Ford cars. It had always used the two vane swinging piston type of shock absorber which had been adapted for the automobile by Houdaille and so far as appears it has continued to use only that type. The casing of its shock absorber before Pennington consisted of a top and bottom part, the latter being cup-shaped with the peripheral walls integral with the bottom portion. The top member of the casing was screwed into it and over the top was put a cup-shaped cover, extending over the joint between the top and the bottom portion, which trapped any liquid which leaked out. Means for injecting the trapped leakage into the casing were provided. In this construction the abutments had to be inserted in the cupped bottom part of the casing in one or another of the known ways. The important thing is that they were not integral with the casing, and so did not have the lessened jointage and lessened potential leakage that would have provided.

The bottom part of the casing carried in its center an end bearing for the piston shaft. There was another bearing for that shaft in the center of the top member of the casing and when it went out through the cup of the fluid trap of course it had to have a tight packing. The highly significant thing about this feature of the defendant's old construction is that, as the

double-vane piston was carried on a shaft in its center and that shaft was mounted on bearings in the center of the casing, there were two pressure chambers which provided balanced resistance at each working part of the piston. It was concentric as opposed to the eccentric assembly of Pennington; or balanced in contrast to unbalanced in action if one prefers so to call it.

The lateral thrusts Pennington had to contend with were accordingly not present in the defendant's shock absorber which set up in use only rotary pressure upon the abutments which in turn transmitted only that to the casing in which they were held. Consequently there was no lateral twisting between the bearings of the piston and the casing which would so tend to break the alignment that unusual anchorage to prevent that had to be provided. If one understands the difference in this regard between the problem Pennington faced, and presumably solved, in his one vane piston hydraulic shock absorber; and the comparatively simple task the defendant had in successfully overcoming the turning action of the rotary pressure which alone was put in action in its two vane shock absorber the failure of the plaintiff to prove infringement will be clear and not surprising. Because of this difference in anchorage requirements the defendant did not use, or need to use, the more elaborate combination of dowel bolts and cap screws which hold together the casing members of the plaintiff. And for the self-same reason it did not need to, and did not, use anything the plaintiff may have invented and claimed in the three claims in suit.

It is so clear that it will be taken as self-evident that as regards this patent the ordinary use of broaching; of dowels; and of cap screws was old. And it is, of course, clear that the defendant could continue to manufacture the shock absorber it had made and sold before Pennington. And none of the claims in suit are method claims anyway. The only change the defendant made in the accused shock absorbers was in the manner of putting the abutments into the cup part of the casing. Instead of putting them in as before, it made them integral with a ring which fitted tightly into the cup and was pressed into place under such high pressure that the ring would not easily be turned in the cup even by the rotary action it might be subjected to in use. But to make sure that there would be no such turning to any disturbing extent, ordinary metal dowels were inserted through the abutment carrying ring and the bottom of the cup-shaped member into which it was pressed. Then the top casing member was put on and held to the bottom by a screw ring. After that the cupped cap of the fluid trap was put on with its sides extended over the joint between the cupped bottom of the casing and the top member of the casing. Conceivably, there could be some leaking of fluid between the pressed-in ring and the sides of the cupped member of the casing and conceivably that would drain into the fluid trap but, if so, it would still drain there through the joint between the top and the bottom of the casing. That was the same joint that was covered by the cover of the fluid trap in the defendant's old shock absorber. And it was old, if not obvious, to have the cap of the fluid trap extend over every joint through which fluid could leak outside the casing of such a shock absorber. The defendant merely continued to do as to that what it had long done before Pennington.

Nor did it take anything from Pennington in pressing into its old cup-shaped bottom part a lining ring carrying integral abutments. Perhaps that ring was a fair equivalent of Pennington's abutment bearing middle casing member, but however that may be it was old to use a casing member with integral abutments in such hydraulic shock absorbers. Sutton showed that in his patent No. 1,341,395, granted May 25, 1920. By using its old bottom casing and pressing into it the ring-held abutments the plaintiff did nothing which Pennington taught or claimed.

That leaves as the only possible act of infringement the defendant's use of dowels to hold the pressed-in ring from turning in the cup if pressures were set up in use that overcome the friction. The dowels the defendant used, however, were just the ordinary ones made in the ordinary way dowels have long been made; enough smaller than the holes which they were designed to fit to make assembly reasonably easy then slipped in and left there. Whether they were the primary or the secondary means of holding the ring from turning in the cup makes no difference since they were but an old and well-known means for holding parts in place. That being so, the fact that in two of the ac-

cused devices the dowels did not go into the top member at all does not set them apart from the other on the question of infringement. One may use ordinary dowels where one may be able to just as one may use ordinary nails or screws. Consequently neither in any particular nor in the whole did the defendant infringe any of the claims in suit. Those claims are not cover-all blankets but are to be read in the light of the specifications and the prior art. Thompson v. Westinghouse Electric Mfg. Co., 2 Cir., 116 F.2d 422; Hookless Fastener Co. v. G. E. Prentice Mfg. Co., 2 Cir., 68 F.2d 848; Lovell v. Seybold Machine Co., 2 Cir., 169 F. 288. While the plaintiff's patented device and the accused shock absorbers do have much in common, as indeed they must to be hydraulic absorbers designed for automobile use, they differ widely in the respects which are decisive in this suit. That does away with the substantial sameness of means and result which must be proved to make out the infringement of a new combination of old elements. Electric Railroad Signal Co. v. Hall Railroad Signal Co., 114 U.S. 87, 5 S.Ct. 1069, 29 L. Ed. 96; Milwaukee Carving Co. v. Brunswick-Balke Collender Co., 7 Cir., 126 F. 171.

■ As the defendant did not infringe, the cause of action based on the allegations as to the confidential submission of the invention was not made out. Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632; Rosenthal v. Celanese Corporation of America, 2 Cir., 135 F.2d 405, decided May 4th.

Decree affirmed.

L. HAND, Circuit Judge (dissenting).

I do not think that "dowels" are one of the elements of claims 27, 28 or 37. They are specifically made such in claims 4, 6, 7, 8, 9 and 10, and we should not import them into the general language used in the claims in suit. At least it is clear that they are not part of claim 37. Therefore unlike my brothers, I fail to see any defense on the score of non-infringement. The only possible anticipations are Taylor, No. 1,438,507 and Sutton, No. 1,341,395, both of which showed "integral abutments." Although in each the defects in mounting could have been readily amended, neverthless under well settled law, neither as it stood was an anticipation, for each was utterly unworkable; it would have gone to pieces upon the first long drive. Moreover, it actually did nothing to advance the art; it was still-born.

The only question, so far as I can see, is whether the futile suggestion of these patents should defeat Pennington's contribution—a contribution which it is not an exaggeration to call revolutionary, for his absorber has substantially superseded all others. I cannot answer such a question by generalities, though one may find apt ones to fit either side of every patent suit. When we are to measure the degree of originality necessary to any advance in the arts, I know of no other rod than history. Had Pennington filed his application soon after Taylor and Sutton, I should probably not have thought that he had invented anything; the appearance in quick succession of several embodiments of the same idea is a good indication that it was already in bud and was sure shortly to come to flower. But that was not the case here. Sutton appeared in May, 1920, Taylor in December, 1922. They were open to the art; but, as I have said, the art utterly ignored them. It is most unlikely that this was because of the bad designing if the disclosure had been recognized as the solution which it proved to be; and certainly we are justified in supposing that the defendant must have known of them for it is the largest maker of absorbers in the country. Yet what did it do? Again and again it tried in one way after another to fix separate abutments into the chamber; and again and again it failed. These were not the fumblings of a tyro, but the best skill of the leader in this particular branch of the industry. Besides these experiments the Patent Office was littered with other intermediate efforts, all equally unsuccessful.

It was in this situation that in November, 1928, Pennington filed his application, nearly six years after Sutton had appeared. Even assuming that it was no more than an adaptation of what Taylor and Sutton had disclosed, I think that it was an invention; for I know no surer mark of originality than to pick up what others have discarded as impracticable and useless, and make it into what all would have chosen, if they had had eyes to see. It is of course possible to look at all patents as odious monopolies; perhaps they are; perhaps the condition interpolated about a hundred years ago that their production must evince some exceptional talent is not the right protection; certain it is that our

attitude towards them has greatly changed in twenty years. Yet I cannot see—until some tangible and authoritative substitute is at hand—how we can administer the existing system without recognizing as authentic evidence of high talent, the discovery of new combinations, though made of elements which have long been open to all, if they prove at length to answer a need that those thoroughly versed in the matter have been repeatedly and fruitlessly trying to fill.